*Suzanne Scales Windesheim, et al. v. Frank Larocca, et al.*, No. 71, September Term, 2014, Opinion by Adkins, J.

**MARYLAND CODE (1973, 2013 REPL. VOL.), § 5-101 OF THE COURTS AND JUDICIAL PROCEEDINGS II ARTICLE ("CJP") — THREE-YEAR STATUTE OF LIMITATIONS — INQUIRY NOTICE:** Borrowers were on inquiry notice, and, thus, the three-year statute of limitations began to run, when they had knowledge of several elements of critical information about which they claim they were deceived and that suggested their loan transactions were not proceeding as they expected.

**MARYLAND SECONDARY MORTGAGE LOAN LAW, MARYLAND CODE (1975, 2013 REPL. VOL.), § 12-403(a) OF THE COMMERCIAL LAW ARTICLE ("CL") — STATUTORY CONSTRUCTION — INDIRECT ADVERTISING:** Petitioners cannot be liable for "indirectly" advertising false or misleading statements regarding secondary mortgage loans or their availability because there is no evidence that they "brought about" false advertisements.

Circuit Court for Howard County
Case No.: 13-C-11-089075
Argued: April 9, 2015

IN THE COURT OF APPEALS

OF MARYLAND

No. 71

September Term, 2014

SUZANNE SCALES WINDESHEIM, et al.

v.

FRANK LAROCCA, et al.

Barbera, C.J.
Harrell
Greene
Adkins
McDonald
Watts,
Wilner, Alan M. (Retired,
     Specially Assigned),

JJ.

Opinion by Adkins, J.

Filed: June 23, 2015

In 2006 and 2007, Respondents, three married couples (collectively, "Borrowers")[1], obtained home equity lines of credit ("HELOCs") from Petitioners, PNC Mortgage, a division of PNC Bank, N.A. ("PNC"), and its loan officer, Suzanne Scales Windesheim (collectively, "Windesheim and her Employer" or "Petitioners"). Borrowers allege that these HELOC transactions were part of an elaborate "buy-first-sell-later" mortgage fraud arrangement carried out by Petitioners and numerous other Defendants.[2] In December 2011, Borrowers filed a putative class action lawsuit in the Circuit Court for Howard County, alleging numerous causes of action including, but not limited to, fraud, conspiracy, and violations of Maryland consumer protection statutes. In this case, we consider whether the Court of Special Appeals erred in reversing the Circuit Court's grant of summary judgment for Windesheim and her Employer.

### FACTS AND LEGAL PROCEEDINGS[3]

Because the facts of this case are somewhat complex, we review them in stages.

---

[1] Borrowers include Frank and Catherine Larocca (the "Laroccas"), Kenneth and Angela Pfeifer (the "Pfeifers"), and Mehdi Nafisi and Forough Iranpour (the "Nafisi-Iranpours").

[2] Other than Windesheim and her Employer, Defendants include: the Creig Northrop Team, P.C. (the "Northrop Team"); Crieghton Northrop ("Mr. Northrop"); Carla Northrop ("Ms. Northrop"); Long & Foster Real Estate, Inc. ("Long & Foster"); Wells Fargo Bank, N.A. ("Wells Fargo"); Prosperity Mortgage Company ("Prosperity"); Michelle Mathews, a loan officer for Prosperity who worked in the Northrop Team's offices; Lakeview Title Company, Inc. ("Lakeview"), a licensee of Long & Foster; and Lindell Eagan, a part owner of Lakeview and an employee of Long & Foster.

[3] Because the Circuit Court for Howard County granted summary judgment in favor of all Defendants, Borrowers never proved that Defendants perpetrated mortgage fraud. Our description of how the alleged fraud unfolded is based on the allegations in Borrowers' First Amended Complaint.

**Borrowers Encouraged to "Buy-First-Sell-Later"**

In 2006 and 2007, Borrowers became interested in selling their current homes and purchasing new homes. Borrowers contracted with Realtor Defendants[4] to represent them in the real estate transactions. Realtor Defendants advised and encouraged Borrowers to "buy-first-sell-later," meaning Borrowers would use HELOCs to extract equity from their current homes that they could use to purchase new homes before their current homes were sold. By extracting the equity in their current homes, Borrowers could make offers to purchase new homes that were not contingent on the sale of their current homes. These non-contingent offers would be more attractive to potential sellers. Realtor Defendants assured Borrowers that a "buy-first-sell-later" plan was "common and appropriate."

**Borrowers Referred To Michelle Mathews At Prosperity Mortgage**

To effectuate the buy-first-sell-later arrangement, Realtor Defendants advised Borrowers to simultaneously apply for two mortgage loans—a "bridge financing" HELOC against their current homes and a primary residential mortgage for their new homes. To facilitate these lending transactions, Realtor Defendants referred Borrowers to Michelle Mathews, a loan officer with Prosperity Mortgage Company ("Prosperity")[5] who worked out of the same office location as Realtor Defendants. Mathews told Borrowers that bridge loan financing was a "common lending tool at Prosperity." Borrowers provided accurate

---

[4] Realtor Defendants include Long & Foster, the Northrop Team, and Mr. Northrop.

[5] Prosperity Mortgage was a joint venture between Long & Foster and Wells Fargo. Notwithstanding its relationship with Wells Fargo, in this case, Prosperity performed the underwriting and loaned the capital associated with Borrower's primary residential mortgages.

financial information to Mathews for the purpose of qualifying to purchase their new homes. After obtaining Borrowers' financial information and preparing mortgage applications, Mathews created Mortgage Approval Letters stating that Borrowers were pre-approved for primary residential mortgages for their new homes that were not contingent upon the sale of their current homes. In reality, without selling their current homes, Borrowers did not have sufficient funds to be approved for their new primary residential mortgages.

### National City, Not Prosperity, Provided The HELOCs

Borrowers believed at all times that Mathews was processing the HELOCs through Prosperity. Because loan underwriting standards would not permit Prosperity to approve a HELOC secured by a home intended for sale, Mathews had to get National City Mortgage ("National City"),[6] a separate mortgage lender, to provide the HELOCs. Unbeknownst to Borrowers, Mathews sent Borrowers' financial information to Windesheim, a loan officer for National City. Mathews then waited for National City to approve the HELOCs before she submitted Borrowers' paperwork for the primary residential mortgages.

Using the financial information that Mathews provided, Windesheim completed Uniform Residential Loan Applications ("HELOC Applications") on behalf of Borrowers without ever speaking with them. Windesheim falsely represented on the HELOC Applications that she had contact with Borrowers to obtain their financial information.

---

[6] PNC is the successor to National City. *PNC Gets National City in Latest Bank Acquisition*, http://www.nytimes.com/2008/10/25/business/25bank.html?_r=0 (last visited Jun. 12, 2015). We use either "PNC" or "National City" as appropriate in context.

3

Because National City's underwriting standards would also not permit them to approve a HELOC for a home intended for sale, Windesheim also falsely represented on the HELOC Applications that the HELOCs would be secured by Borrowers' "primary residences." Based on this misrepresentation, National City eventually approved the HELOCs. At the HELOC closings, Borrowers signed the HELOC Applications that Windesheim had prepared.[7]

**Prosperity Approved Primary Residential Mortgages Based On Fraudulent Rental Income**

With the bridge financing arranged, Prosperity submitted Borrowers' Uniform Residential Loan Applications for the primary residential mortgages on the new homes ("Primary Mortgage Applications") to Prosperity's underwriters.[8] Because the Primary Mortgage Applications would not be approved with the new debt created by the HELOCs and without the proceeds from the sales of Borrowers' current homes, however, Mathews needed to create additional monthly income for Borrowers. To accomplish this, one or more Defendants fabricated leases between Borrowers and fictitious tenants and forged Borrowers' signatures.[9] As alleged, one or more Defendants then surreptitiously inserted

---

[7] Borrowers closed their HELOCs on the following dates: the Laroccas on May 18, 2006; the Pfeifers on November 21, 2006; and the Nafisi-Iranpours on May 14, 2007.

[8] We will refer to the HELOC Applications and the Primary Mortgage Applications collectively as the "Applications."

[9] In their First Amended Complaint, Borrowers do not specifically allege which of the numerous Defendants actually fabricated the leases.

fraudulent rental income on the Primary Mortgage Applications that Borrowers signed when they settled on their new homes and closed their primary residential mortgages.[10, 11]

## Counsel Contacted Borrowers And They Filed Suit

In 2010 and 2011, after counsel contacted Borrowers to inform them that they may have been the victims of mortgage fraud, Borrowers allegedly discovered for the first time the fabricated leases on which their signatures were forged and the false rental income on the Primary Mortgage Applications. Borrowers then filed their class action lawsuit, alleging 11 Counts against Petitioners and the other Defendants.[12] Borrowers alleged that the mortgage fraud caused them to incur unnecessary commissions, fees, interest, expenses, taxes, and penalties associated with the mortgage transactions; sell their old homes below market value as a result of the financial burden imposed by the HELOC debt; and pay above-market prices their new homes without reasonable home-sale contingencies.

---

[10] The HELOC Applications that Borrowers signed at their HELOC closings did not include the fraudulent rental income.

[11] Borrowers settled on their new homes and closed their primary residential mortgages on the following dates: the Laroccas on May 30, 2006; the Pfeifers on November 30, 2006; and the Nafisi-Iranpours on May 29, 2007.

[12] The 11 Counts included the following: Fraud - Intentional Misrepresentation (Count I); Fraud - Concealment or Nondisclosure (Count II); Constructive Fraud (Count III); Civil Conspiracy to Commit Fraud (Count IV); Negligence (Count V); Aiding and Abetting Tortious Conduct (Count VI); Respondeat Superior (Count VII); Unfair and Deceptive Trade Practices under the Consumer Protection Act ("CPA"), Maryland Code (1975, 2013 Repl. Vol.), § 13-101, *et seq.* of the Commercial Law Article ("CL") (Count VIII); Violation of the Maryland Mortgage Fraud Protection Act, Maryland Code (1974, 2010 Repl. Vol.), § 7-401, *et seq.* of the Real Property Article (Count IX); Violation of the Maryland Secondary Mortgage Loan Law ("SMLL"), CL § 12-403(a) (Count X); and Unjust Enrichment (Count XI).

5

**Circuit Court and Court of Special Appeals Proceedings**

Defendants moved to dismiss, arguing the statute of limitations barred Borrowers' suit. The Circuit Court denied the motions. After extensive discovery, Defendants moved for summary judgment on all Counts.[13] Concluding that the statute of limitations barred Counts I–IX and XI and that no Defendants violated the Maryland Secondary Mortgage Loan Law ("SMLL"), Maryland Code (1975, 2013 Repl. Vol.), § 12-403(a) of the Commercial Law Article ("CL") as a matter of law, the Circuit Court granted Defendants' motions. Borrowers appealed.

In a reported opinion, the Court of Special Appeals reversed the Circuit Court's grant of summary judgment as to Counts I–IX and XI against all Defendants, and as to Count X against PNC and Windesheim.[14] The intermediate appellate court concluded that the Circuit Court erred in granting summary judgment on the statute of limitations issue because there was a genuine dispute as to whether Borrowers reasonably should have discovered the mortgage fraud before counsel contacted them.[15] As for Count X—the SMLL Count—the Court of Special Appeals held that there was a genuine dispute as to

---

[13] Before the Circuit Court could rule on Realtor Defendants' motion for summary judgment, Borrowers filed a Second Amended Complaint adding Ms. Northrop, Lakeview, and Eagan as Defendants and a cause of action under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2607 (2012). The Circuit Court eventually struck the new cause of action, but allowed the Second Amended Complaint to replace the First Amended Complaint as to Counts I–XI.

[14] *Larocca v. Creig Northrop Team, P.C.*, 217 Md. App. 536, 94 A.3d 197, *cert. granted sub nom. Windesheim v. Larocca*, 440 Md. 225, 101 A.3d 1063 (2014).

[15] *Id.* at 556, 94 A.3d at 209.

whether Windesheim and her Employer violated CL § 12-403(a), the SMLL's prohibition against falsely advertising secondary mortgage loans.[16]

Defendants appealed, and we granted the Petitions for Writ of Certiorari filed by Windesheim and her Employer only. In our Writ of Certiorari issued on October 21, 2014, we agreed to consider the following:

1. Did the Court of Special Appeals err by holding that an employee of a lender is a "lender" for purposes of civil liability under the Maryland Secondary Mortgage Loan Law?

2. Did the Court of Special Appeals err by holding that [Borrowers] stated a claim on which relief could be granted under the Maryland Secondary Mortgage Loan Law?

3. Did the Court of Special Appeals err by holding that a cause of action under the Maryland Secondary Mortgage Loan Law was "another specialty" under Section 5-102 of the Maryland Courts and Judicial Proceedings Article and therefore entitled to a 12-year statute of limitations?

4. Did the Court of Special Appeals err by holding that it was a question of fact to be decided by the jury as to whether [Borrowers'] claims against [Windesheim and her Employer] in the [c]ase [b]elow were barred by the 3-year statute of limitations under Section 5-101 of the Maryland Courts and Judicial Proceedings Article?

5. Whether as a matter of law a defendant may be liable under the SMLL, where the false advertising that is the purported basis for the claim occurred orally in a private setting, and where the record contains no evidence that the defendant participated in any way in the communication of the statements allegedly constituting false advertising?

Because we answer yes to the second and fourth questions, we need not address the other questions and shall reverse the judgment of the Court of Special of Appeals.

---

[16] *Id.* at 570, 94 A.3d at 217.

**STANDARD OF REVIEW**

We review the Circuit Court's grant of summary judgment as a matter of law. *Goodwich v. Sinai Hosp. of Balt., Inc.*, 343 Md. 185, 204, 680 A.2d 1067, 1076 (1996) ("The standard of review for a grant of summary judgment is whether the trial court was legally correct." (citation omitted)). Before determining whether the Circuit Court was legally correct in entering judgment as a matter of law in favor of Windesheim and her Employer, we independently review the record to determine whether there were any genuine disputes of material fact. *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 294, 936 A.2d 343, 351 (2007). A genuine dispute of material fact exists when there is evidence "upon which the jury could reasonably find for the plaintiff." *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 739, 625 A.2d 1005, 1011 (1993) (citation omitted). "We review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Myers v. Kayhoe*, 391 Md. 188, 203, 892 A.2d 520, 529 (2006) (citation omitted).

**DISCUSSION**

**Are Counts I–IX And XI Barred By The Three-Year Statute Of Limitations?**

Pursuant to Maryland Code (1973, 2013 Repl. Vol.), § 5-101 of the Courts and Judicial Proceedings II Article ("CJP"), civil actions are generally subject to a three-year statute of limitations: "A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." Maryland has adopted the "discovery rule," which "tolls the accrual of the limitations period until the time the plaintiff discovers, or through

8

the exercise of due diligence, should have discovered, the injury." *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95–96, 756 A.2d 963, 973 (2000). In *Poffenberger v. Risser*, 290 Md. 631, 636, 431 A.2d 677, 680 (1981), we made this rule generally applicable in all civil actions.

Notice is critical to the discovery rule. Before an action can accrue under the discovery rule, "a plaintiff must have notice of the nature and cause of his or her injury." *Frederick Rd.*, 360 Md. at 96, 756 A.2d at 973. There are two types of notice: actual and constructive. *Poffenberger*, 290 Md. at 636–37, 431 A.2d at 680. Actual notice is either express or implied. *Id.* at 636, 431 A.2d at 680. As the name suggests, express notice "is established by direct evidence" and "embraces not only knowledge, but also that which is communicated by direct information, either written or oral, from those who are cognizant of the fact communicated." *Id.* at 636–37, 431 A.2d at 680 (citation and internal quotation marks omitted). Implied notice, also known as "inquiry notice," is notice implied from "knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry (thus, charging the individual) with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued." *Id.* at 637, 431 A.2d at 681 (citation and internal quotation marks omitted). Stated simply, inquiry notice is "circumstantial evidence from which notice may be inferred." *Id.* at 637, 431 A.2d at 680 (citation and internal quotation marks omitted). Constructive notice is notice presumed as a matter of law. *Id.* at 636, 431 A.2d at 680. Unlike inquiry notice, constructive notice does not trigger the running of the statute of limitations under the discovery rule. *Id.* at 637, 431 A.2d at 681.

9

Borrowers argue that the Court of Special Appeals correctly held that genuine disputes of material fact precluded summary judgment based on the three-year statute of limitations under CJP § 5-101. They identify four principal reasons why they were not on inquiry notice of the fraud when they closed the HELOCs and primary residential mortgages. First, they argue that because they dispute that they actually read the Applications they signed at the closings, no inquiry notice can be established as a matter of law. Second, Borrowers maintain that, even assuming there is no dispute that they read the Applications, the contents of those documents would not induce a reasonable person to investigate a potential fraud. Third, they argue that because Windesheim and her Employer concealed the fraud from them, CJP § 5-203 tolled the statute of limitations until counsel contacted Borrowers in 2010 and 2011. Finally, Borrowers contend that they were in a fiduciary relationship with Petitioners that prevented them from discovering the fraud. We address these arguments in turn.

### *Did Borrowers Read The Applications?*

The records contains an affidavit of a forensic document examiner expert who concluded that Borrowers' signatures on the Primary Mortgage Applications are authentic. Also in the record is the affidavit of Concetta Cho, a settlement agent for Lakeview, who testified that she witnessed Borrowers sign the Primary Mortgage Applications. Borrowers do not offer competing affidavits to contradict the opinion of the document examiner or the sworn statement by the settlement agent.

In their opposing affidavits, Borrowers state that they "did not have time during the loan process to read and understand all of the documents provided to [them], and [they]

10

did not have the real estate and/or lending background to understand much of what was provided to [them]." Borrowers argue that because they deny having read and understood the Applications, a jury must determine whether they possessed knowledge of the contents of the Applications and whether this knowledge would cause a reasonable person to investigate a potential fraud.

Borrowers' focus on their lack of knowledge of the contents of the Applications is misdirected. Under long-settled law, if there is no dispute that they signed the Applications, they are presumed to have read and understood those documents as a matter of law. *See Merit Music Service, Inc. v. Sonneborn,* 245 Md. 213, 221–22, 225 A.2d 470, 474 (1967) ("[T]he law presumes that a person knows the contents of a document that he executes and understands at least the literal meaning of its terms."); *Binder v. Benson,* 225 Md. 456, 461, 171 A.2d 248, 250 (1961) ("[T]he usual rule is that if there is no fraud, duress or mutual mistake, one who has the capacity to understand a written document who reads and signs it, or without reading it or having it read to him, signs it, is bound by his signature as to all of its terms." (citations omitted)). We will refer to this rule as the "signature doctrine."

Borrowers do not dispute that they signed HELOC Applications at their HELOC closings or that the HELOC Applications from their PNC loan files "appear[] to bear a copy of [their] signatures." Yet they assert in their affidavits that they cannot confirm that their signatures on any of the Applications are authentic.[17] Other than this, Borrowers offer

---

[17] They state in their affidavits: "Given the substantial evidence of fraud and forgery by all of the Defendants, we cannot confirm that the loan documents in our possession and

no evidence tending to show that their signatures on the HELOC Applications were forged.[18]

Borrowers' refusal to confirm the authenticity of the signatures on the Applications represents nothing more than conjectural doubt. Any such doubt is insufficient to defeat a motion for summary judgment when the moving party has attested to the existence of the material fact. *Beatty*, 330 Md. at 738, 625 A.2d at 1011 ("[W]hen a movant has carried its burden the party opposing summary judgment 'must do more than simply show there is some *metaphysical doubt* as to the material facts.'" (emphasis added) (citation omitted)); *see id.* at 739, 625 A.2d at 1011–12 (Summary judgment cannot be denied if there is only the "*slightest doubt*" as to the facts because that would "mean that there could hardly ever be a summary judgment, for at least a slight doubt can be developed as to practically all things human." (emphasis added) (citation and internal quotation marks omitted)); *see also Carter v. Aramark Sports & Entm't Servs., Inc.*, 153 Md. App. 210, 225, 835 A.2d 262, 271 (2003) (The facts offered by a party opposing summary judgment "must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely *suspicions*." (emphasis added) (citation and internal quotation marks omitted)).

---

in the Defendants' loan files are the same documents we executed during the loan process for the primary mortgage or HELOC[s]. This includes the [Applications]."

[18] Although Borrowers offered the opinion of a document examiner who concluded that Borrowers' signatures on the fake leases were forged, they did not offer this expert's opinion with respect to the authenticity of Borrowers' signatures on the HELOC Applications.

Based on the foregoing, we conclude there is no dispute that Borrowers signed the Applications. Accordingly, Borrowers are presumed as a matter of law to have read these documents and understood their contents. *See Vincent v. Palmer,* 179 Md. 365, 375, 19 A.2d 183, 189 (1941) ("[W]hen one signs a release or other instrument, he is presumed in law to have read and understood its contents[.]" (citation omitted)).

### *Does Borrowers' Knowledge Of The Contents Of The Applications Constitute Inquiry Notice As A Matter Of Law?*

Because presumptions of law do not trigger the discovery rule, *see Poffenberger*, 290 Md. at 637, 431 A.2d at 681, the presumption that Borrowers have read and understood the Applications does not fully resolve whether they were on inquiry notice without examining the content of those documents. We conduct a separate review of that content to determine whether it was sufficient to place them on inquiry notice of a potential fraud.

Borrowers argue that "even had [they] read every bit of information in the [Applications], there remains a dispute of fact as to whether these different bits of information would cause a reasonable person to make inquiry." Windesheim and her Employer counter by identifying several elements of information in the HELOC Applications that they argue placed Borrowers on inquiry notice. First, the HELOC Applications indicated that Windesheim had completed them during a phone interview with the Laroccas and the Nafisi-Iranpours and received application information from the Pfeifers via mail. Borrowers, however, maintain that they only gave their financial information to Mathews and never spoke with or had any contact with Windesheim. Second, the HELOC Applications indicate that Windesheim worked for National City, but

13

Borrowers swore that they believed they were working with Prosperity exclusively. Third, the HELOC Applications specify that the loans would be secured by Borrowers' primary residences, but Borrowers knew they intended to sell their current homes. Finally, the Primary Mortgage Applications included false rental income that Borrowers now maintain they never provided to Prosperity.

We turn to case law to determine whether Borrowers' knowledge of the foregoing content in the Applications constitutes inquiry notice as a matter of law. *Bank of New York v. Sheff*, 382 Md. 235, 854 A.2d 1269 (2004) is particularly instructive. In that case, we determined that the plaintiffs were on inquiry notice upon receiving documents indicating that the financial transaction in which they were participating was not proceeding consistent with their expectations.

Prince George's County had issued $50 million in tax-exempt revenue bonds and transferred the proceeds to a consortium of health care providers in the District of Columbia ("D.C." or the "District") and Prince George's County that comprised the Greater Southeast Healthcare System. *Id.* at 237, 854 A.2d at 1270–71. Part of the security for repayment of the bonds was a lien on the accounts receivable and other assets of the individual health care providers. *Id.*, 854 A.2d at 1271. To perfect that lien, it was necessary to file a UCC Financing Statement with the Maryland State Department of Assessments and Taxation ("SDAT"), as well as with the Clerk of the Circuit Court for Prince George's County, and the D.C. Recorder of Deeds. *Id.* Because a financing statement was never filed with the D.C. Recorder of Deeds, however, the bondholders lost the opportunity to perfect against third parties a first lien on the receivables of the health

14

care providers located in the District. *Id.* That became problematic when the consortium defaulted on the bonds and it was discovered that another creditor had obtained a first lien on the receivables of one of the large hospitals in D.C., the Greater Southeast Community Hospital ("GSCH"). *Id.* at 238, 854 A.2d at 1271.

The Bank of New York, as trustee for the bondholders, and four municipal bond funds holding the bonds (collectively "plaintiffs"), blamed Piper & Marbury ("P&M"), a counsel for the county, for failing to file a financing statement in the District. *Id.* Plaintiffs sued P&M for negligence and breach of fiduciary obligation. *Id.* We affirmed the summary judgment in favor of P&M on limitations grounds, concluding plaintiffs were on inquiry notice of their causes of action against P&M more than three years before they filed suit. *Id.* at 247, 854 A.2d at 1276. The inquiry notice was triggered when the plaintiffs received multiple sets of documents suggesting that the bond transaction was not proceeding as they expected because P&M neglected to file a financing statement in the District. *Id.* First, plaintiffs received a Closing Binder "that contained all of the closing documents, including financing statements filed with SDAT and the Clerk in Prince George's County, but did not contain a financing statement for the District." *Id.* at 245, 854 A.2d at 1275. Second, GSCH sent plaintiffs

> a copy of the transaction documents, which recited that GSCH was the legal and beneficial owner of the receivables to be purchased by [another creditor] "free and clear of any [l]iens," that [another creditor] would receive valid ownership of the receivables "subject to no third-party claims of interest thereon," and that "[n]o effective financing statement . . . covering any Receivable or the Collections with respect thereto is on file in any recording office."

15

*Id.* at 245–46, 854 A.2d at 1275–76 (second and fourth alterations in original) (ellipses in original). Third, plaintiffs received a Compliance Certificate that "confirmed what the other documents implied—that [plaintiffs] did not have a perfected lien on the GSCH receivables." *Id.* at 246, 854 A.2d at 1276.

Similarly, in this case, there were two sets of documents that suggested that the loan transactions were not proceeding as Borrowers expected. The HELOC Applications suggested that a bank other than Prosperity and a loan officer other than Mathews were providing the HELOCs. And the Primary Mortgage Applications suggested that Prosperity was approving Borrowers' new mortgages based on false rental income that Borrowers never provided to Mathews.

*Miller v. Pacific Shore Funding*, 224 F. Supp. 2d 977 (D. Md. 2002), *aff'd*, 92 F. App'x 933 (4th Cir. 2004) is also instructive. The United States District Court for the District of Maryland, applying Maryland law, dismissed the claims of one of the plaintiffs, concluding they were barred by CJP § 5-101's three-year statute of limitations because the plaintiff was on inquiry notice of his injury when he signed loan documents identifying charges about which he alleged he was deceived.

The plaintiffs, borrowers, filed a putative class action against numerous banks and lending institutions (the "lenders"). *Id.* at 983. The plaintiffs asserted three counts against the lenders, including violations of the Maryland Consumer Protection Act ("CPA"), CL §13-101 *et seq.,* and SMLL and the formation and performance of illegal contracts. *Id.* The gravamen of the plaintiffs' claims was that the lenders charged and collected excessive

16

or unauthorized fees in conjunction with loans that were secured by junior mortgages on their residences. *Id.*

The District Court granted the lenders' motion to dismiss, concluding that the plaintiff was on inquiry notice when he closed his loan because the charges about which he alleged he was deceived were all expressly identified in the closing documents he signed, and suit was filed more than three years after the closing. *Id.* at 990. By signing the closing documents identifying the charges, the plaintiff "had sufficient knowledge of circumstances indicating he might have been harmed." *Id.* (citation omitted).

In this case, like in *Miller*, Borrowers signed loan documents containing information about which they were allegedly deceived. In their First Amended Complaint, Borrowers contend they were deceived when Mathews represented that "bridge loan financing was a common lending tool at Prosperity," and then "surreptitiously shifted" Borrowers' HELOC Applications to Windesheim and National City. But the HELOC Applications expressly indicated that Windesheim was processing them because National City was the intended lender.

Borrowers also contend they were deceived when Prosperity approved their primary residential mortgages based on false rental income because it "was not included in [Borrowers'] financial information that was used to apply for the . . . HELOCs." But the Primary Mortgage Applications expressly identified "gross rental income." Because Borrowers signed the Applications and the Applications identified false gross rental income, they were on inquiry notice that something was amiss.

17

Based on *Sheff* and *Miller*, we conclude that Borrowers' knowledge of the contents of the Applications was sufficient to place them on inquiry notice of their claims against Windesheim and her Employer when Borrowers closed their HELOCs and primary residential mortgages in 2006 and 2007. Because Borrowers signed the Applications at the closings, they are presumed to have read and understood their contents. With knowledge of facts about which they claim they were deceived and that suggested that their loan transactions were not proceeding as they expected, Borrowers had information that "would cause a reasonable person in the position of [Borrowers] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [fraud]." *Pennwalt Corp. v. Nasios*, 314 Md. 433, 448–49, 550 A.2d 1155, 1163 (1988) (citation and internal quotation marks omitted). This does not, however, wrap up limitations altogether. We also must decide whether there is evidence that Petitioners concealed the fraud or that Petitioners and Borrowers were in a fiduciary relationship, as either evidence could toll the statute of limitations.

### *Did CJP § 5-203 Toll The Statute of Limitations?*

"Maryland law recognizes that it is unfair to impart knowledge of a tort when a potential plaintiff is unable to discover the existence of the claim due to fraud or concealment on the part of the defendant." *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 170, 857 A.2d 1095, 1105 (2004) (citation omitted). Section 5-203 of the Courts and Judicial Proceedings II Article, "a tangent of the discovery rule,"[19] provides that "[i]f the

---

[19] *Supik v. Bodie, Nagle, Dolina, Smith & Hobbs, P.A*, 152 Md. App. 698, 715, 834 A.2d 170, 179 (2003).

18

knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud." Section 5-203 "does not require that the defendant commit a fraud distinct from that initially committed for the purpose of keeping the plaintiff in ignorance of his or her cause of action." *Frederick Rd.*, 360 Md. at 98, 756 A.2d at 975. Instead, CJP § 5-203 applies when two conditions are satisfied: "(1) the plaintiff has been kept in ignorance of the cause of action by the fraud of the adverse party, and (2) the plaintiff has exercised usual or ordinary diligence for the discovery and protection of his or her rights." *Id.* at 98–99, 756 A.2d at 975.

Rejecting the notion that CJP § 5-203 might toll the statute of limitations against them, Windesheim and her Employer insist that "no employee of PNC's predecessor was alleged to have participated in any fraudulent concealment." As Borrowers point out, however, they alleged civil conspiracy and "[i]t is well established in Maryland law that a conspirator can be liable for the conduct of a co-conspirator." *Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 128, 892 A.2d 479, 485 (2006). We review the record to ascertain whether there is a genuine dispute that any Defendants concealed the alleged fraud from Borrowers.

*Dashiell v. Meeks*, 396 Md. 149, 913 A.2d 10 (2006) is instructive regarding what evidence is required to prove Defendants concealed the fraud from Borrowers. Like this case, the dispositive issue in *Dashiell* was whether the plaintiff was on inquiry notice when he signed a critical document, the contents of which formed the basis of a later suit. Meeks asked his attorney, Dashiell, to draft a prenuptial agreement. *Id.* at 156–57, 913 A.2d at

19

14. Dashiell reviewed an initial draft of the agreement with Meeks that contained a waiver of alimony provision, but the version Meeks ultimately signed did not contain this provision. *Id.* at 157, 913 A.2d at 14. Meeks sued Dashiell for negligence in omitting the provision and counseling him to sign the agreement without reading it. *Id.* In an affidavit, Meeks alleged that after reviewing the initial draft with Dashiell, the lawyer made changes to the agreement that were more favorable to Meeks's ex-wife without Meeks's knowledge, and then encouraged Meeks to sign the agreement without reading it. *Id.* at 170, 913 A.2d at 22. Meeks further alleged that as a result of his reliance on Dashiell's advice not to read the agreement, Meeks did not discover the lack of the alimony waiver provision until over a decade after he reviewed the initial agreement. *Id.*

The trial court granted summary judgment for Dashiell, concluding that under the signature doctrine, Meeks was presumed to know the contents of the agreement he signed, and that knowledge was sufficient to trigger the running of the statute of limitations because Meeks was on inquiry notice when he signed the agreement. *Id.* at 166–67, 913 A.2d at 20. Meeks appealed, arguing that the trial court erred by not applying the discovery rule. *Id.* at 157, 913 A.2d at 15. The Court of Special Appeals reversed, and we affirmed that judgment, holding that when a party conceals the contents of a document by discouraging another from reading it, the statute of limitations does not begin to run when the document is signed. *Id.* at 168, 913 A.2d at 21. We concluded that the trial court erred because if Meeks could prove his allegation that Dashiell concealed the omission of the alimony waiver provision, the statute of limitations would not have begun to run until Meeks actually discovered that the provision was missing. *Id.* at 170, 913 A.2d at 22.

20

Here, unlike in *Dashiell*, there is no evidence Defendants concealed the contents of the Applications by discouraging Borrowers from reading them. Borrowers rely on Mathews's deposition in which she asserted her Fifth Amendment privilege against self-incrimination in response to the several questions relating to her communications with Borrowers about the contents of the Primary Mortgage Applications: (1) Whether she "indicated to them, through words and deeds, that . . . [she was] inputting accurate information to [the] loan documents;" (2) Whether she communicated to Borrowers "that the closing documents that were used in their settlement contained the information that they had submitted;" and (3) Whether she informed Borrowers that the Primary Mortgage Applications included false rental income. Borrowers ask us to infer from Mathews's refusal to answer these questions that she discouraged Borrowers from reading the Primary Mortgage Applications.

To be sure, we are permitted to draw adverse inferences when a party in a civil case asserts her Fifth Amendment privilege in response to discovery questions. *See Robinson v. Robinson*, 328 Md. 507, 515–16, 615 A.2d 1190, 1194 (1992) ("[W]here a party in a civil proceeding invokes the Fifth Amendment privilege against self-incrimination in refusing to answer a question posed during that party's testimony, the fact finder is permitted to draw an adverse inference from that refusal."). The only reasonable inference from Mathews's refusal to answer these questions, however, is that Borrowers did not know before closing their primary residential mortgages that the Primary Mortgage Applications included rental income. That fact does not justify the inference by any reasonable juror that she also told them at closing not to read the Applications.

21

In their affidavits, Borrowers state that they "did not have time during the loan process to read and understand all of the documents provided to [them]." Unlike *Dashiell*, however, they never state that Defendants discouraged them from reading the Applications. Without evidence that Defendants concealed the contents of the Applications from Borrowers by discouraging them from reading those documents, we cannot say that Borrowers "ha[d] been kept in ignorance of the[ir] cause[s] of action by the fraud of [Defendants]." *Frederick Rd.*, 360 Md. at 98–99, 756 A.2d at 975.

### Were Petitioners and Borrowers In A Fiduciary Relationship?

Borrowers also assert that an alleged fiduciary relationship between themselves and Petitioners should toll the statute of limitations until counsel contacted Borrowers in 2010 and 2011. A fiduciary relationship, "by its nature, gives the confiding party the right to relax his or her vigilance to a certain extent and rely on both the good faith of the other party and that party's duty to disclose all material facts." *Id.* at 99, 756 A.2d at 975.[20] Nevertheless, we need not explore the application of this relaxed standard—the "fiduciary rule"—because there is no evidence that Petitioners and Borrowers were ever in a fiduciary relationship.

"Maryland law is cautious in creating fiduciary obligations between banks and borrowers, absent special circumstances." *Polek v. J.P. Morgan Chase Bank, N.A.*, 424

---

[20] When a fiduciary relationship exists, "failure to discover the facts constituting fraud may toll the statute of limitations, if: (1) the relationship continues unrepudiated, (2) there is nothing to put the injured party on inquiry, and (3) the injured party cannot be said to have failed to use due diligence in detecting the fraud." *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 99, 756 A.2d 963, 975 (2000) (citation omitted).

Md. 333, 366, 36 A.3d 399, 418 (2012) (citation omitted); *see also Parker v. Columbia Bank*, 91 Md. App. 346, 368, 604 A.2d 521, 532 (1992) ("[T]he relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between a debtor and a creditor, and is *not fiduciary in nature*." (emphasis added) (citation omitted)). There are four "special circumstances" under which a fiduciary relationship can exist between a lender and a borrower: the lender "(1) took on any extra services on behalf of [the borrowers] other than furnishing . . . money . . . ; (2) received a greater economic benefit from the transaction other than the normal mortgage; (3) exercised extensive control . . . ; or (4) was asked by [the borrowers] if there were any lien actions pending." *Polek*, 424 Md. at 366, 36 A.3d at 418. Borrowers do not cite, and our search does not reveal, any evidence in the record suggesting that one or more of these "special circumstances" existed. Thus, we will not transmute the contractual relationship between Borrowers and Petitioners into a fiduciary relationship.

In sum, we hold that neither CJP § 5-203 nor the fiduciary rule tolled the statute of limitations. There is neither evidence that Petitioners concealed the contents of the Applications by discouraging Borrowers from reading them nor evidence that Borrowers and Petitioners were ever in a fiduciary relationship. Because Borrowers were on inquiry notice of their causes of action in 2006 and 2007 when they closed their HELOCs and primary residential mortgages, and they did not file suit until December 2011, we further hold Petitioners are entitled to judgment as a matter of law that Counts I–IX and XI are all barred by the three-year statute of limitations.

23

**Did Windesheim Or PNC Violate CL § 12-403(a) (Count X)?**

In deciding whether Borrowers were entitled to judgment as a matter of law that Petitioners violated CL § 12-403(a), the Court of Special Appeals addressed four separate issues and decided that (1) SMLL claims are subject to a 12-year statute of limitations as a specialty; (2) Windesheim could qualify as a "lender;" (3) "dissemination of information to smaller groups of the public" could qualify as "advertising;" and (4) there was a genuine dispute that Windesheim and her Employer "indirectly" advertised. *See Larocca*, 217 Md. App. at 556–70, 94 A.3d at 209–17. Because we consider the "indirect" advertising issue dispositive as to whether the intermediate appellate court erred in reversing summary judgment for Petitioners on Count X, we limit our analysis to that issue.

### *Did Windesheim Or PNC Indirectly Advertise False Or Misleading Statements Regarding Secondary Mortgage Loans Or Their Availability?*

The record reveals that Mathews and Prosperity advertised in flyers and on the Northrop Team website that they could provide "Home Equity Lines and Loans (to make your client non-contingent)." Borrowers contend this statement was false and misleading because Prosperity did not have a loan program to make Borrowers non-contingent— Prosperity could not provide both the HELOCs and the primary residential mortgages and had to fabricate rental income to approve the primary residential mortgages. Assuming this statement was false and misleading, we address whether Petitioners could be liable under CL § 12-403(a) for indirectly advertising it.

Section 12-403(a) provides that "[a] person may not advertise directly or *indirectly* in the State any false or misleading statement regarding secondary mortgage loans or their

24

availability." (Emphasis added.). Violation of CL § 12-403(a) or the other provisions of the SMLL carries a severe penalty.[21] Eager to prove they committed no such violation, Windesheim and her Employer argue they cannot be liable for "indirect" advertising because they never made any statements regarding HELOCs or their availability. Borrowers disagree, contending that Petitioners can be liable for "indirect" advertising because Prosperity advertised HELOCs on behalf of Windesheim and her Employer. These arguments are premised on competing interpretations of what it means to advertise "indirectly" under CL § 12-403(a). Petitioners' argument assumes advertising "indirectly" requires actually making false or misleading statements. Borrowers insist on a broader interpretation for advertising "indirectly" that would include Windesheim's facilitating Prosperity's false or misleading advertisements.

Bearing in mind that "[t]he cardinal rule of statutory interpretation is to ascertain and carry out the true intention of the Legislature," we begin with the words of the statute and accord those words their ordinary and natural significance. *Shenker v. Laureate Educ.,*

---

[21] CL § 12-413 provides:
> Except for a bona fide error of computation, if a lender violates any provision of this subtitle he may collect only the principal amount of the loan and may not collect any interest, costs, or other charges with respect to the loan. In addition, a lender who knowingly violates any provision of this subtitle also shall forfeit to the borrower three times the amount of interest and charges collected in excess of that authorized by law.

CL § 12-414 provides:
> Any lender, his officer or employee and any other person who willfully violates any provision of this subtitle is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $1,000 or imprisonment not exceeding one year or both.

*Inc.*, 411 Md. 317, 347–48, 983 A.2d 408, 426 (2009). "If the language of the statute is clear and unambiguous, we need not look beyond" the language of the statute to ascertain the General Assembly's intent. *Anderson v. Council of Unit Owners of Gables on Tuckerman Condominium*, 404 Md. 560, 572, 948 A.2d 11, 19 (2008).

When the General Assembly does not define a statutory term, we fill in the meaning by first looking to the "plain and ordinary meaning" of the term. *Schreyer v. Chaplain*, 416 Md. 94, 108, 5 A.3d 1054, 1062 (2010) (citation omitted). Because "indirect" advertising is not defined in the SMLL, we consult dictionary definitions of "indirect."[22] *The American Heritage Dictionary of the English Language* defines "indirect" as an adjective meaning "[d]iverging from a direct course; roundabout" and "[n]ot directly planned for; secondary." *Id.* 893 (4th ed. 2006).

Based on the language of CL § 12-403(a), we discern two equally reasonable interpretations of advertising "indirectly." First, a lender could advertise "indirectly" by making a false or misleading statement to a potential borrower that the same potential borrower then re-communicates to another potential borrower. *Cf. Sherman v. Robinson*, 80 N.Y.2d 483, 485, 606 N.E.2d 1365, 1366 (1992) (an "indirect sale" of liquor to a minor

---

[22] *See Marriott Emps. Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 447, 697 A.2d 455, 460 (1997) ("Although dictionary definitions do not provide dispositive resolutions of the meaning of statutory terms, dictionaries . . . do provide a useful starting point for determining what statutory terms mean, at least in the abstract, by suggesting what the legislature could have meant by using particular terms." (ellipses in original) (citations and internal quotation marks omitted)); *see also* Norman J. Singer & Shambie Singer, *Statutes And Statutory Construction*, § 47:28, 478–79 (7th ed. 2014) ("Absent a statutory definition, . . . dictionaries can provide a useful starting point to determine a term's meaning, at least in the abstract, by suggesting what a legislature could have meant by using a particular term.").

is one in which a vendor sells alcohol to one customer who then shares that alcohol with a minor); *Bunker's Glass Co. v. Pilkington plc*, 202 Ariz. 481, 484, 47 P.3d 1119, 1122 (Ct. App. 2002), *aff'd*, 206 Ariz. 9, 75 P.3d 99 (2003) (an "indirect purchas[e]" occurs when a retailer purchases the manufacturer's products from a wholesale distributor). In this interpretation, the advertising is "indirect" because the original statements were "not directly planned for" the third party. *See The American Heritage Dictionary of the English Language* 893. Second, a party advertises "indirectly" by having another party advertise false or misleading statements on the first party's behalf. *Cf. Sword v. NKC Hosps., Inc.*, 714 N.E.2d 142, 147–48 (Ind. 1999) (vicarious liability, a legal theory under which a party can be liable for the negligence of another acting *on the first party's behalf*, is a form of "*indirect* legal responsibility." (emphasis added) (citation and internal quotation marks omitted)). In this interpretation, the advertising is "indirect" because the first party "diverg[es] from a direct course" by enlisting the support of another party to communicate the false or misleading statements to potential borrowers. *The American Heritage Dictionary of the English Language* 893.

With two reasonable interpretations of advertising "indirectly," the language of CL § 12-403(a) is ambiguous. *See Deville v. State*, 383 Md. 217, 223, 858 A.2d 484, 487 (2004) ("A statute is ambiguous when there are two or more reasonable alternative interpretations of the statute."). When the language of a statute is ambiguous, we look to the statute's legislative history, purpose, and structure in ascertaining the General Assembly's intent. *Walzer v. Osborne*, 395 Md. 563, 573, 911 A.2d 427, 432 (2006).

27

We begin with legislative history. The General Assembly first enacted the SMLL with Chapter 390 of the Acts of 1967 (Senate Bill 566). Section 12-403(a) was originally Maryland Code (1957, 1972 Repl. Vol.), Article 66, § 67. In 1975, the General Assembly transferred the SMLL into the new Commercial Law Article and Article 66, § 67 became CL § 12-403(a) and (b). *See* Chapter 49 of the Acts of 1975. Other than the General Assembly's purpose statements and revisor's notes in Chapter 390 of the Acts of 1967 and Chapter 49 of the Acts of 1975, our search has uncovered no other legislative history for CL § 12-403(a).[23] These statements and notes provide no help in ascertaining which definition of advertising "indirectly" is most consistent with the General Assembly's intent.

We turn to statutory purpose. In *Thompkins v. Mountaineer Investments, LLC*, 439 Md. 118, 123–24, 94 A.3d 61, 64–65 (2014), we explained that the purpose of the SMLL is to protect consumers:

---

[23] The purpose of Chapter 390 of the Acts of 1967 was to
> generally provide for the licensing of persons in the business of negotiating secondary mortgage loans, and to generally provide for the regulations of such persons and such loans, to give the Banking Commissioner certain duties and powers in the regulation of such persons and such loans, to provide penalties for violations and to generally relate to secondary mortgage transactions and the regulation of persons in this business.

The purpose of Chapter 49 of the Acts of 1975 was to
> add[] a new article to the Annotated Code of Maryland, to be designated and known as the "Commercial Law Article," to revise, restate, and recodify the laws of this State relating and pertaining to commercial and related transactions and activities, in general, including matters relating to . . . secondary mortgage loans[.]

In this session law, the revisor's note associated with CL § 12-403(a) states that "[t]his section is new language derived without substantive change from Art. 66, § 67."

The SMLL is a consumer protection measure that was designed to incorporate, complement, and prevent circumvention of the usury laws by limiting the interest, fees, and other charges that a lender could collect from a borrower as part of a second mortgage loan on a residential property. It was designed to curb predatory practices that had caused many people, often minorities and older people who were in debt and ignorant of the intricacies of the law, to lose their homes and become subject to crushing deficiency judgments for hugely inflated interest, costs, and fees. It is a law intended to guard the foolish or unsophisticated borrower, who may be under severe financial pressure, from his own improvidence.

(Citations and internal quotation marks omitted.) Because false or misleading statements regarding secondary mortgage loans or their availability have the potential to harm consumers regardless of their source, it is reasonable that the General Assembly would intend to proscribe both types of advertising "indirectly." *Cf. Wash. Home Remodelers, Inc. v. State, Office of Att'y Gen., Consumer Prot. Div.*, 426 Md. 613, 628, 45 A.3d 208, 217 (2012) (the Maryland Consumer Protection Act, CL §13-101 *et seq.*, should be afforded a "liberal interpretation"). Accordingly, we conclude that a party advertises "indirectly" under CL § 12-403(a) when it advertises false or misleading statements that are re-communicated to another party and when it works with another party to advertise false or misleading statements on its behalf.

The record is completely devoid of any evidence that Windesheim or PNC advertised false or misleading statements that were later re-communicated. Thus, Petitioners' conduct did not satisfy our first definition of advertising "indirectly."

We narrow our inquiry to our second definition of advertising "indirectly"— whether Windesheim or PNC advertised *through* Prosperity. Borrowers argue

29

circumstantial evidence reveals that Petitioners advertised through Prosperity. This circumstantial evidence primarily consists of emails demonstrating that Mathews would work with new borrowers to secure financial information and preliminary paperwork for HELOCs and then transfer that information and paperwork to Windesheim for her to complete the process of approving the HELOCs through National City. For example, in an October 19, 2006 email between Mathews and Windesheim discussing the Pfeifers' HELOC, Mathews wrote, "Sue—here are some of their documents for Home Equity." The "documents" to which Mathews refers are various forms of proof of income such as paystubs and bank and retirement account statements. In an April 10, 2007 email between Mathews and Windesheim regarding a $234,000 HELOC for the Nafisi-Iranpours, Mathews attached a "Borrower's Consent for Credit Check" that the Nafisi-Iranpours had already signed.

Borrowers ask us to infer that because Mathews initiated the contact with new clients before she worked with Windesheim to approve the HELOCs through National City, Windesheim must have known that Prosperity was falsely advertising that they could provide HELOCs to permit their clients to buy-first-sell-later. Borrowers contend that there was no way for the clients to learn about the HELOCs without this false advertising. We need not determine whether Windesheim had knowledge of the false advertising by Prosperity, however, because mere knowledge that another is falsely advertising would not suffice for "indirect advertising" under the SMLL.

The precursor to CL § 12-403(a) was Maryland Code (1957, 1972 Repl. Vol.), Article 66, § 67. This earlier version, slightly different from CL § 12-403(a), read: "[i]t

30

shall be unlawful for any person *to cause to be* placed before the public in this State, directly or indirectly, any false or misleading advertising matter pertaining to secondary mortgage loans or the availability thereof[.]" (Emphasis added.) In 1975, when the General Assembly transferred Article 66, § 67 into the Commercial Law Article and created CL § 12-403(a), the General Assembly made the statute more concise by removing the phrase "to cause to be placed before the public" so that it read: "A person may not advertise directly or indirectly in the State any false or misleading statement regarding secondary mortgage loans or their availability." Chapter 49 of the Acts of 1975, 439. The Revisor's Note, however, explicitly stated that the language of CL § 12-403(a) was "derived without substantive change from Art[icle] 66, § 67." Chapter 49 of the Acts of 1975, 440. The General Assembly has not changed the language of CL § 12-403(a) since 1975.

The phrase "to cause to be placed before the public" is an important indicator of what conduct the General Assembly intended would be required to hold one liable for advertising "indirectly." To "cause" means "[t]o bring about." *The American Heritage Dictionary of the English Language* 296; *accord Black's Law Dictionary* 251 (9th ed. 2009). We have applied this same definition of "cause." *See, e.g.*, *Pittway Corp. v. Collins*, 409 Md. 218, 248, 973 A.2d 771, 789 (2009) (a negligent act becomes a superseding *cause* when it "*brings about* harm different in kind from that which would otherwise have resulted from the actor's negligence" (emphasis added) (citation and internal quotation marks omitted)); *Assateague Coastkeeper v. Md. Dep't of Env't*, 200 Md. App. 665, 710, 28 A.3d 178, 205 (2011) (defining "cause" as "to bring about").

31

We infer that by inserting "to be placed before the public" immediately after "cause," the General Assembly intended that a person would have to bring about the placing of a false or misleading statement before the public to be liable for advertising "indirectly." The General Assembly's non-substantive revision in which it removed the phrase "cause to be," did not change the law:

> [R]ecodification of statutes is presumed to be for the purpose of clarity rather than change of meaning and, thus, even a change in the phraseology of a statute by a codification will not ordinarily modify the law unless the change is so radical and material that the intention of the Legislature to modify the law appears unmistakably from the language of the Code.

*Allen v. State*, 402 Md. 59, 71–72, 935 A.2d 421, 428 (2007) (citation and internal quotation marks omitted). Specifically, the General Assembly did not intend to change the requirements for advertising "indirectly."

In this case, there is no evidence that Windesheim or PNC did anything to bring about the false advertising of HELOCs. We find no evidence that Petitioners encouraged or contracted with Prosperity to falsely advertise, participated in the development of the false advertisements, or did anything else that would allow us to conclude that they brought about the false advertisements. Even assuming Windesheim knew about the false advertisements, this knowledge did nothing to bring them about.

### *Conspiracy*

Borrowers also contend, alternatively, that Windesheim and her Employer can be vicariously liable for "indirect" advertising based on a conspiracy theory. We explained

32

the nature of civil conspiracy in *West Maryland Dairy v. Chenowith*, 180 Md. 236, 243, 23 A.2d 660, 664 (1942):

> When individuals associate themselves together in an unlawful enterprise, any act done by one of the conspirators is in legal contemplation the act of all. The mind of each being intent upon a common object, and the energy of each being enlisted in a common purpose, each is the agent of all the others, and the acts done and words spoken during the existence of the enterprise are consequently the acts and words of all.

Civil conspiracy requires proof of three elements: "1) A confederation of two or more persons by agreement or understanding; 2) [S]ome unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and 3) Actual legal damage resulting to the plaintiff." *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 154, 916 A.2d 257, 284 (2007) (citation and internal quotation marks omitted). Civil conspiracy may be proved by circumstantial evidence because "in most cases it would be practically impossible to prove a conspiracy by means of direct evidence alone." *Hoffman v. Stamper*, 385 Md. 1, 25, 867 A.2d 276, 291 (2005) (citation and internal quotation marks omitted). More specifically, a civil conspiracy

> may be established by inference from the nature of the acts complained of, the individual and collective interest of the alleged conspirators, the situation and relation of the parties at the time of the commission of the acts, the motives which produced them, and all the surrounding circumstances preceding and attending the culmination of the common design.

*Id.* at 25–26, 867 A.2d at 291 (citation and internal quotation marks omitted).

There are three unlawful acts that Borrowers identify as the basis for a civil conspiracy between Petitioners and Prosperity: (1) falsely advertising that Prosperity could

33

provide Borrowers' HELOCs and their primary residential mortgages; (2) misrepresenting on the HELOC Applications that Borrowers were applying for HELOCs against their primary residences; and (3) falsifying rental income on the Primary Mortgage Applications.

Evidence that Prosperity falsely advertised that it could provide the HELOCs and primary residential mortgages fails the first element of the civil conspiracy test. Although the facts suggest that Windesheim knew that Mathews was working with the same clients for which Windesheim processed HELOC applications,[24] there is no evidence from which one could reasonably infer that Windesheim knew that Mathews and Prosperity were falsely advertising that Prosperity, not National City, would provide the HELOCs. Without any evidence that Windesheim or her PNC knew about the false advertising, we cannot conclude there was an agreement or understanding between Petitioners and Prosperity to falsely advertise the availability of HELOCs.

The second—misrepresenting that Borrowers were applying for HELOCs against their primary residences—also fails, for a somewhat different reason. There are several emails that support an inference that Windesheim and Mathews agreed that Windesheim

---

[24] Windesheim was included on emails in which Mathews discussed arranging HELOCs for clients. Other emails demonstrate that Mathews would obtain initial financial information from potential borrowers and then transfer that paperwork to Windesheim so she could complete the applications and process the loans through National City.

would misrepresent to National City that Borrowers were applying for HELOCs against their primary residences.[25]

An agreement to have Borrowers make that misrepresentation to National City may be an illegal conspiracy to defraud the bank. But it is the wrong conspiracy. Borrowers' suit is based on alleged false advertising. For the acts of one co-conspirator to be regarded as acts of the other co-conspirators for purposes of establishing liability, the acts must be **in furtherance** of the conspiracy. *Mackey*, 391 Md. at 144, 892 A.2d at 495; *see id.* ("[C]ivil co-conspirators . . . act as agents of one [an]other when engaging in acts *in furtherance* of their conspiracy." (emphasis added)). Here, Prosperity's falsely advertising that it could provide the HELOCs cannot be regarded as an act of Petitioners because the only evidence of conspiracy between Prosperity and Windesheim was to defraud Windesheim's employer, PNC. Thus, there can be no liability for Petitioners.

Finally, there is no evidence that Windesheim or PNC conspired with Prosperity to falsify rental income. Borrowers offered no evidence identifying which of the numerous

---

[25] In a March 2, 2007 email with a potential borrower, Mathews lamented that the potential borrower did not have a contract on her current home. Mathews then committed to arranging a HELOC for the borrower and expressed that she "hope[d] that lowering the price will help you obtain the offer on your house soon." Windesheim was included on this email. In another email initiated by Mathews and on which Windesheim was included, Mathews confirmed that Windesheim would process a HELOC for the Nafisi-Iranpours to "go non [c]ontingent." The Nafisi-Iranpours's HELOC Application bears Windesheim's name and the box for "primary residence" is checked. Moreover, in an email between Mathews, Windesheim, and Frank Larocca, Mathews discussed removing the "for sale" sign from the Laroccas old home while it was appraised. The email goes on to address tax return documents that could be used to qualify the Laroccas for a HELOC. The Larocca's HELOC Application bears Windesheim's name and the box for "primary residence" is checked.

Defendants falsified the rental income. Although Mathews may have had a financial interest in ensuring that the fraudulent rental income was included on the Primary Mortgage Applications, neither PNC nor Windesheim shared this interest. *See Hoffman*, 385 Md. at 25, 867 A.2d at 291 (One of the circumstances we consider when determining whether there is evidence of civil conspiracy is "the individual and collective interest of the alleged conspirators."). Their interest was only in the HELOCs, which were not contingent on the Prosperity loans. Given a lack of interest in Prosperity's loans and no direct evidence of agreement, we find no evidence in the record from which a reasonable juror could infer that Petitioners and Mathews or Prosperity conspired to falsify rental income.

In sum, not only is there no evidence that Windesheim or PNC brought about false advertising of HELOCs, but also there is no factual basis upon which they could be held liable for false advertising based on a conspiracy theory. Accordingly, we conclude as a matter of law that Petitioners did not advertise "indirectly" under CL § 12-403(a).

### CONCLUSION

In conclusion, we hold that Borrowers were on inquiry notice of their causes of action against Windesheim and her Employer when Borrowers closed their HELOCs and primary residential mortgages in 2006 and 2007. Borrowers are presumed to have read and understood the contents of the Applications because it is undisputed that Borrowers signed them at the closings. With knowledge of several elements of critical information that suggested that their loan transactions were not proceeding as they expected, Borrowers had sufficient information for inquiry notice. Neither CJP § 5-203 nor the fiduciary rule tolled the statute of limitations because there is neither evidence that Petitioners

36

encouraged Borrowers not to read the Applications nor evidence that Borrowers and Petitioners were in a fiduciary relationship. Thus, because Borrowers did not file their suit until December 2011, Windesheim and her Employer are entitled to judgment as a matter of law that Counts I–IX and XI are barred by the three-year statute of limitations.

We further hold that Petitioners did not indirectly advertise any false or misleading statements about secondary mortgage loans or their availability. There is neither evidence that Windesheim or PNC brought about false advertising nor evidence that would support liability for false advertising based on a conspiracy theory. Thus, Petitioners are entitled to judgment as a matter of law that they did not violate CL § 12-403(a) (Count X).

Accordingly, we reverse the judgment of the Court of Special Appeals reversing the Circuit Court's grant of summary judgment for Windesheim and her Employer on Counts I–XI.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AS TO PETITIONERS. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AS TO PETITIONERS AND TO CONDUCT SUCH FURTHER PROCEEDINGS AS ARE NECESSARY AND NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENTS.**