REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1065

September Term, 2014

_____

ESTATE OF HAROLD L. ADAMS, et al.

v.

CONTINENTAL INSURANCE COMPANY,
et al.

_____

Kehoe,
Beachley,
Kenney, James A., III
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Beachley, J.

_____

Filed: June 1, 2017

*Judge Kathryn G. Graeff, Judge Douglas R. M. Nazarian, Judge Kevin F. Arthur, Judge Michael W. Reed, and Judge Daniel A. Friedman did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

In this opinion, we attempt to finally resolve asbestos-related litigation stemming from complaints filed in the Circuit Court for Baltimore City more than twenty years ago. Appellants consist of plaintiffs represented by three different groups of law firms: 1) the Law Offices of Peter Angelos ("LOPA plaintiffs" or "LOPA"); 2) Goodman, Meagher & Enoch, LLP and Clifford Cuniff; Ashcraft & Gerel ("GME/Cuniff/A&G Plaintiffs"); and 3) Skeen, Goldman, LLP ("Goldman Plaintiffs").[1]

Appellants were plaintiffs in asbestos-related litigation against MCIC Inc. (formerly McCormick Asbestos Company, "MCIC"). In a lawsuit filed in the Circuit Court for Baltimore City on May 20, 2005, appellants sought, for the second time, additional insurance coverage and proceeds pursuant to a 1994 settlement agreement with appellees, MCIC and its insurers: United States Fidelity and Guaranty Company ("USF&G"); Royal Insurance Company ("Royal");[2] Liberty Mutual Insurance Company; Continental Insurance Company ("Continental");[3] and Hartford Accident and Indemnity Company ("Hartford"). Appellants brought claims against appellees for negligent misrepresentation,

---

[1] Appellants can be further grouped as follows: LOPA plaintiffs, and non-LOPA plaintiffs. Separating the appellants into LOPA and non-LOPA plaintiffs will become relevant in the Discussion section of this opinion. When we refer to "appellants," however, we refer to both the LOPA and Non-LOPA plaintiffs.

[2] Royal Insurance Company is currently known as Arrowood Indemnity Company. We will refer to the company as "Royal" throughout this opinion.

[3] According to LOPA's complaint, Continental Insurance Company was formerly Seaboard Fire & Marine Insurance Company. We will refer to the company as "Continental" throughout this opinion. Continental did not file a separate brief; instead, it filed a Line adopting the arguments made in the other appellees' briefs.

fraudulent misrepresentation, and fraud by concealment. Specifically, appellants claim that the appellees fraudulently obtained the settlement by intentionally misrepresenting the extent of MCIC's available insurance coverage, and that the appellees knew that their misrepresentations regarding the available coverage were false.

In August 2012, appellees filed motions for summary judgment, arguing that appellants' claims were time-barred pursuant to the three-year statute of limitations in Maryland Code (1973, 2013 Repl. Vol.) § 5-101 of the Courts and Judicial Proceedings Article ("CJP").[4] Appellees argued, *inter alia*, that appellants were on inquiry notice of their claims as early as 1997 or 1998, shortly after this Court published its opinion in *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605 (1997), *cert. denied*, 348 Md. 205 (1997).

On November 20, 2012, the circuit court dismissed appellants' claims on the basis that they were time-barred. Appellants present several questions for our review,[5] which we have rephrased as follows:

---

[4] The parties filed many prior pleadings, including a motion to dismiss, amended complaints, motions to intervene and to proceed by class action.

[5] Appellants presented their issues as follows:

LOPA presented the following questions in its brief:

1. Did the circuit court err in holding that this Court's 1997 *Porter Hayden* decision put Plaintiffs on inquiry notice that they may have been defrauded by MCIC and its Insurers when they entered into the 1994 Settlement Agreement and in holding that, notwithstanding the lack of any indication that MCIC and its Insurers had knowingly and intentionally

1. Did the circuit court err in finding that, as a matter of law, the appellants' claims were barred by the statute of limitations because appellants were on inquiry notice of the misrepresentations as early as 1997?

---

deceived Plaintiffs, limitations for fraud nevertheless began to run from the date of that decision?

2. Did the circuit court err by overlooking a material dispute of fact when it failed to recognize the importance of the second prong of the limitations discovery rule in fraud cases and failed to apply the second prong to the well-concealed fraud perpetrated by Defendants here?

3. Did the circuit court err by granting summary judgment without permitting Plaintiffs to conduct discovery to demonstrate the efforts undertaken by Defendants to conceal facts relevant to the second prong of the limitations discovery rule?

The "GME/Cuniff/A&G Plaintiffs" presented the following question:

Did the Circuit Court improperly act as a fact-finder, fail to recognize or address the actual alleged fraud, and otherwise misapply fundamental summary judgment principles in holding that the GME/Cuniff/A&G Plaintiffs were on notice as a matter of law of MCIC and the Insurers' wrongful conduct more than three (3) years prior to filing their fraud, misrepresentation, and concealment claims?

The "Goldman Plaintiffs" presented the following questions:

1. Did the Circuit Court improperly act as a fact-finder, fail to recognize the basis of the alleged fraud, and otherwise misapply fundamental summary judgment principles in holding that the Goldman Plaintiffs were on notice as a matter of law of MCIC and the Insurers' wrongful conduct more than three years prior to filing their fraud, misrepresentation and concealment claims?

2. Did the Circuit Court erroneously grant summary judgment against the Goldman Plaintiffs on the basis of their alleged receipt of the 1993 Nagle fragmentary policy materials, when in fact Goldman generated a triable material issue for the jury that he never received same?

2. Did the circuit court err in granting summary judgment without permitting appellants to conduct additional discovery?

We answer the first question in the negative, and need not decide the second. Accordingly, we affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

### Appellants Litigate *Abate I* while MCIC and Its Insurers Pursue Settlement

MCIC, which was founded in 1934, sold and installed asbestos insulation products. By the early 1970s, it was clear that asbestos was hazardous, and MCIC ceased selling and installing asbestos-containing products in approximately 1973.

In the late 1980s, several law firms, including those representing appellants, collectively filed several thousand lawsuits against MCIC asserting personal injury claims resulting from exposure to asbestos-containing products. In April 1990, the cases of 8,555 plaintiffs were consolidated for trial ("*Abate I*").

While the *Abate I* lawsuit was pending, MCIC and its insurers pursued settlement of the lawsuits against MCIC. On February 14, 1992, MCIC's attorney, John Nagle III, Esq. ("Nagle"), wrote a letter to LOPA attorney Thomas Friedman, Esq. ("Friedman"), with an attached schedule of all available insurance policies sold to MCIC. The schedule contained a note claiming that the list was prepared by USF&G on behalf of MCIC, and the information provided was "based primarily on secondary evidence of coverage." The schedule also contained two columns under the heading "products coverage," one listing "per person limit[s]," and the other listing "per occurrence limit[s]." Framing the settlement discussion in terms of available "products coverage" had, as we will explain, a

significant impact on the amount of coverage appellants received in settlement, as well as on the eventual causes of action in this case.

On February 27, 1992, Friedman responded, submitting a total demand of $19,527,900. Mr. Friedman concluded his letter saying:

> From the insurance information you supplied, it appears that your client may, in a best case scenario, not have sufficient insurance coverage to satisfy our demand. *Under these circumstances, we are prepared to recommend in settlement of all our claims the total amount of your insurance coverage.* It is imperative, therefore, that you determine as expeditiously as possible the exact amount of insurance coverage and that our tender is submitted to your principal.[6]

(Emphasis added). Notably, Friedman recommended seeking all available coverage, and not just "products coverage."

On July 8, 1992, the jury found MCIC strictly liable for asbestos-related injuries suffered by foreseeable users and foreseeable bystanders.[7] Settlement discussions pertaining to damages ensued, with counsel for MCIC repeatedly stating that there were "limited assets available to MCIC," and that bankruptcy proceedings or a settlement with another claimant could likely impact the amount appellants could recover.

On December 7, 1992, Nagle sent a letter to Friedman enclosing a revised schedule of insurance (dated November 6, 1992) that was, in most respects, identical to the earlier version. The schedule identified the "per person" and "per occurrence" limits as "products

---

[6] Contemporary documents indicated that the insurers (or at least USF&G) were aware of the nature of appellants' demand, noting in one instance that "[p]laintiffs are actually demanding MCIC's policy limits."

[7] The jury did not, however, determine the damages in this case.

coverage." Nagle indicated that he was providing the information "as it [was] related to [him] by USF&G," noting that "no physical copies of policies of insurance exist with respect to coverage provided to MCIC by its various insurers over the decades," and explaining that "the policies were disposed of prior to the time when MCIC was first named as a defendant," and "[a]ll reasonable efforts have been made to locate such policies."

## The 1994 Settlement Agreement

On September 14, 1993, Baltimore City Circuit Court Administrative Judge Joseph H.H. Kaplan held a conference to discuss settlement. Nagle had requested the conference so that MCIC could propose to pay approximately $13 million, all of MCIC's remaining insurance coverage, to settle all of the cases pending against MCIC. At the conference, appellants' attorneys requested all of the policies that the insurers had ever issued to MCIC, but counsel for the insurers claimed that the policies could not be produced for review. Nagle insisted that the approximately $13 million offer represented MCIC's remaining insurance assets. Appellants' counsel insisted on reviewing the policies before accepting any settlement, and Judge Kaplan instructed the insurers to provide whatever policy documents they possessed in anticipation of future settlement discussions.

## The Nagle Documents

On October 15, 1993, Nagle sent a letter to appellants' counsel with "insurance coverage documents" attached, which he indicated were "recently provided to [him] by the

respective carriers of MCIC, Inc."[8]  We shall refer to these documents as the "Nagle Documents."  The letter stated that Royal had not yet provided him with policy information, but that he would deliver those documents once he received them.  The letter also included two tables which summarized the "limits of each carrier and MCIC (exclusive of Royal)."  The letter concluded that the total amount of coverage available was $12,300,000.00 with $11,877,054.90 remaining.[9]

Royal, unable to locate a copy of any insurance policy it sold to MCIC, wrote a letter to Nagle on October 21, 1993, conceding that, although it could not locate them, it had, in fact, issued insurance policies to MCIC.  Royal provided a schedule that listed the policies it issued to MCIC and concluded that the total amount of coverage it provided to MCIC was $1,200,000 based on the "Bodily Injury Limits" of $25,000/50,000 for the first two years and $50,000/100,000 for the remaining 11 years.[10]  Royal reiterated that it did not possess any copies of actual policies, and therefore it claimed that the information it

---

[8] On October 13, 1993, Benjamin Love of USF&G sent the same (or similar) packet of insurance policy information to Judge Kaplan.

[9] The letter summarized the remaining policy limits as follows: Liberty Mutual, $581,869.80; ITT Hartford, $540,324.00; Continental, $272,875.00; USF&G, $725,936.10; Kemper (excess coverage), $4,000,000.00; USF&G (excess coverage), $5,000,000.00; Reliance $756,050.00.

[10] Although Royal could not ascertain the exact "Bodily Injury Limits" for five of the thirteen years, it presumed that the limits for those years were $50,000/$100,000 because Royal consistently issued MCIC policies with those limits after the first two years.

provided was "extremely sketchy." Nagle forwarded Royal's letter to appellants' counsel on October 21, 1993.

**Contents of the Nagle Documents—Types of Coverage and Limits of Coverage**

The Nagle Documents included Declaration sheets[11] for the available policies, which were standard Comprehensive General Liability ("CGL") policies. The Declaration sheets themselves distinguished the available limits of liability. For example, the USF&G Declaration sheet provided maximum limits to the insured for bodily injury in the following ways: $300,000 each occurrence; and $300,000 in the aggregate. The section titled "Limits of Liability" provides, in pertinent part:

> The total liability of the Company for all damages . . . because of bodily injury sustained by one or more persons as the result of any one occurrence shall not exceed the limit of bodily injury liability stated in the declarations as applicable to "each occurrence." Subject to the above provision respecting "each occurrence," the total liability of the Company for all damages because of (1) *all bodily injury included within the completed operations hazard* and (2) *all bodily injury included within the products hazard shall not exceed the limit of bodily injury liability stated in the declarations as "aggregate."*

(Emphasis added). This language explains that a standard CGL policy provides an aggregate limit for bodily injury claims that fall under the "products hazard" or "completed operations hazard." Both of these hazards fall within the "products coverage" umbrella. By only imposing aggregate limits for the specifically mentioned bodily injury claims, the policies implicitly permitted non-aggregated limits for "non-products coverage" claims.

---

[11] A Declaration sheet is a summary of all coverages and limits provided by the insurance policy.

The distinction between "products coverage" and "non-products coverage" is at the heart of appellants' claims.

**Reaching the Agreement**

On November 2, 1993, Judge Kaplan convened a second settlement conference. At that conference, Nagle stated that, having provided the Nagle Documents, he had now offered all insurance coverage, primary as well as excess, in exchange for full settlement and relief from further defense obligation. Nagle admitted that the Nagle Documents were incomplete, but insisted that the total amount of unused and available coverage for MCIC was $13,077,054.90, based on the insurers taking a worst case scenario in calculating that sum.[12]

Appellants' counsel insisted on substantiating that the Nagle Documents included all available policy documents, arguing that they needed to verify the limits of MCIC's coverage or the total remaining coverage before agreeing to settle. To address these concerns, the parties agreed that the insurers would provide affidavits that stated that MCIC's total remaining coverage was approximately $13 million, that the appellees were tendering the limits of remaining unpaid funds, *and that the appellees were not aware of*

---

[12] The $13,077,054.90 figure is the sum of the purported $11,877,054.90 of remaining primary and excess insurance coverage owed by Liberty Mutual, Hartford, Continental, Kemper, and USF&G, and the purported $1,200,000.00 of remaining coverage owed by Royal.

*any other applicable or available coverage.* Judge Kaplan directed the parties to begin drafting a settlement agreement that would include these affidavits.

On August 10, 1994, Judge Kaplan approved the settlement agreement for $12,351,000 which both the appellants and appellees signed.[13] Section 2.2 of the settlement agreement provided, at a minimum, a contractual cause of action if more insurance coverage was found.

> The Defendant agrees that if in addition to the insurance coverage disclosed by Insurers and confirmed by their affidavits . . . other insurance is discovered which would be applicable to claims made, the Defendant will promptly notify Participating Plaintiffs' Counsel and arrange for a pro rata distribution to them for payment to the Plaintiffs . . . .[14]

Attached to the settlement agreement were affidavits from each of the appellees, stating: (1) "a diligent and thorough search" had been made for MCIC's insurance policies; (2) those searches produced information leading each insurer to report the amounts of coverage listed in the settlement agreement; (3) there was no indication that there were any other policies or coverages available other than what was represented; and (4) there was no indication that the stated limits and unpaid funds were other than what was represented. An additional affidavit, provided by Robert I. McCormick, Treasurer of MCIC, stated that, as of April 30, 1994, the assets of MCIC had a total value of $299.89.

---

[13] The final dollar amount represents the claimed total insurance amount minus the payment of specific verdict amounts.

[14] The settlement agreement defined "Defendant" as MCIC, Inc. and "Insurers" as USF&G, Royal, Continental, Hartford, and Lumbermans.

### *Porter Hayden* and an Alternative Theory of Claim Classification

On August 29, 1997, this Court issued its decision in *Porter Hayden*, 116 Md. App. 605 (1997). There, Commercial Union provided liability insurance to Porter Hayden, a company that installed insulation containing asbestos. *Id*. at 617. Commercial Union's policies for Porter Hayden only provided "premises-operations" coverage, or coverage for bodily injury that occurred during the installation or operations process—not to be confused with "Products Hazard" or "products coverage"—coverage for injuries resulting from exposure to completed, hazardous products. *Id*. at 687-88. Noting the narrow scope of coverage in its policy, Commercial Union argued that it had no duty to defend Porter Hayden in asbestos litigation. *Id*. at 688.

We disagreed. The complaints and allegations against Porter Hayden showed that some plaintiffs alleged they had been exposed to asbestos during installation. *Id*. at 691-92. We held that, "it is evident that Porter Hayden could be held liable for the manner in which it conducted *its operations in installing* the asbestos-containing products. In that light, it is not solely covered by the 'Products Hazard' insurance it declined to purchase." *Id*. 692. We concluded that,

> The "Products Hazard" insurance is concerned with injury occurring after possession of the goods or the product has been relinquished or the operation has been completed or abandoned. The nature of some of the allegations in the Master Complaint, however, concern exposure and injury occurring during the operation, such as the emission of asbestos dust during the installation process.
>
> We affirm the ruling . . . that, as a matter of law, there is a potentiality that the asbestos-related claims are covered and that there is, therefore, a duty

-11-

on Commercial Union to defend and, depending on the ultimate findings on the merits, potentially to indemnify.

*Id*. at 692-93.

The ramifications of our decision in *Porter Hayden* were immense to asbestos litigants, and appellants took notice. As explained above, a standard CGL policy provides for aggregate limits—but only as applied to "products coverage" claims. By recognizing a new theory of recovery, and one without aggregate limits, plaintiffs in Maryland could claim that CGL policies provided much greater coverage than previously thought.

On October 3, 1997, a mere thirty-five days after we published *Porter Hayden*, Angelos sent a letter to MCIC's treasurer inquiring about the possibility of additional insurance available, stating:

> As you will recall, there is a Settlement Agreement dated August 10, 1994[,] between MCIC, Inc., several insurance companies, and various plaintiffs' law firms. One of the representations made by MCIC, Inc. and its insurers was that there was a limited amount of insurance available to pay to victims of asbestos-related disease. In fact, each of the insurers signed affidavits set[ting] forth the limited amount of money available to MCIC, Inc. for asbestos-related claims. This representation was the major reason we entered into this agreement and recommended to our clients settlements for such small amounts. Also, this was the primary reason we stopped naming MCIC as a defendant.
>
> It has recently come to my attention *that information provided by the insurers may be inaccurate*, and additional insurance funds may be available under the terms of the policies. Under Section 2.2 of the Settlement Agreement, any additional insurance funds are to be distributed to the plaintiffs.
>
> In light of the above, I think it appropriate that my office review the policies of insurance as quickly as possible so that I can determine what, if any, additional funds may be available to the plaintiffs.

(Emphasis added).

On October 7, 1997, MCIC attorney Bruce R. Chapper responded to Angelos, stating that, on "August 10, 1994, MCIC tendered what it believed to be the total aggregate of insurance coverage available." Chapper assured Angelos that, "in response to [Angelos's] request, there [were] no insurance policies for [his] office to review," but he was "happy to discuss" with Angelos whatever information had "recently come to [his] attention."

On February 11, 1998, Angelos replied by letter that it was "absolutely necessary that [his firm] independently verify whether or not additional coverage exists for MCIC, Inc." He asked that MCIC "cooperate fully in providing [him] copies of the insurance policies." On February 20, 1998, Chapper responded, stating that there were "not now and never have been in the course of [the *Abate I* litigation] any insurance policies for review."

Clifford Cuniff, an attorney for GME, called Nagle on April 1, 1998, to learn the status of MCIC with reference to his case. Nagle explained to Cuniff that MCIC no longer had counsel for that litigation, that MCIC would not respond to service of process, and that MCIC no longer had any assets.

Three weeks later, on April 22, 1998, Chapper met with LOPA attorneys. His notes indicated that at the meeting, the LOPA attorneys

> explained that recent court decisions had interpreted old policies containing provisions for contractors general liability so as not to have any total limit on the policies. Thus they contended that the insurance carriers may be liable for considerably more than the insurance carriers had certified in the affidavits which accompanied the settlement agreement.

-13-

After preliminarily reviewing certain of the evidences of insurance coverage which were in our file, namely, insurance certificates, bills, etc., they made arrangements to have those documents copied . . . ."

Neither party took any significant action in reference to this case until January 4, 2001, when Chapper met with LOPA attorneys to discuss the 1994 settlement and MCIC's insurance coverage. In a follow-up letter, dated February 2, 2001, Chapper stated that

The offer was made to you, however, to assign the plaintiffs whatever rights you believe exist under various insurance policies, the limits of which were believed to have been tendered as part of the settlement. In conjunction with the settlement, MCIC informed plaintiffs of all of its past insurance carriers and all applicable policy numbers.

He stated his impression that LOPA was "going to investigate the possibility of such an assignment and would forward such documentation as may be required to effect the same." On May 25, 2001, Chapper again met with LOPA to discuss their "desire to make claims under various insurance policies which may have insured" MCIC.

### The *Wallace & Gale* Case Adopts the Holding in *Porter Hayden*

In February 2002, a federal court in the District of Maryland decided the case *In re Wallace & Gale Co.*, 275 B.R. 223 (D. Md. 2002).[15] There, plaintiffs sought recovery from insurance companies for asbestos-related bodily injuries. *Id*. at 227. The court acknowledged that *Porter Hayden* created a new theory in which plaintiffs insured by a

---

[15] Due to excessive length, we provide the full citation with procedural history here: *In re Wallace & Gale Co.*, 275 B.R. 223, *opinion vacated in part on reconsideration*, 284 B.R. 557 (D. Md. 2002), *aff'd sub nom.*, *In re Wallace & Gale Co.*, 385 F.3d 820 (4th Cir. 2004), *as amended*, (Nov. 15, 2004), *and aff'd in part sub nom.*, *In re Wallace & Gale Co.*, 385 F.3d 820 (4th Cir. 2004), *as amended*, (Nov. 15, 2004).

CGL policy could pursue installation or operations claims in addition to "products coverage" claims. *Id*. at 239. The court crystalized the significance of that holding with reference to standard CGL policies, stating: "If a claimant's initial exposure occurred while Wallace & Gale was still conducting operations, policies in effect at that time will not be subject to any aggregate limit." *Id*. at 241.

Notably, LOPA was involved in the *Wallace & Gale* case as early as 1995, providing representation to a group of intervening plaintiffs. For *Wallace & Gale*, LOPA hired Scott D. Gilbert, Esq., an expert in insurance law, to prepare a report (the "Gilbert Report") evaluating the application of the insurance policies. LOPA filed the Gilbert Report, dated May 1998, with the U.S. Bankruptcy Court to explain its theory of recovery.

In the Gilbert Report, Gilbert noted that, "None of these policies has an aggregate limit for 'nonproducts' claims . . . . The language of the Travelers Policies follows the standard form language used by the Insurance Services Office ("ISO"). Since 1973, ISO has written standard CGL form policies used by insurers throughout the United States." After establishing that the policies at issue were standard CGL policies, where "nonproducts" claims such as operations claims are not subject to aggregate limits, Gilbert discussed the *Porter Hayden* decision:

> The Maryland courts have adopted the view that asbestos installation claims are nonproducts claims not subject to aggregate limits. In a case directly on point, the Maryland Court of Special Appeals has held that, for purposes of assessing the duty to defend, asbestos bodily injury claims arising from asbestos installation activities are nonproducts claims. *See Commercial Union Ins. Co. v. Porter Hayden Co.*

(Citations omitted). Therefore, based on its expert's report, LOPA knew, no later than May of 1998, that *Porter Hayden* had created a new theory of recovery under standard CGL policies.

**LOPA Files a Motion to Enforce Settlement Agreement and Receives the "Chapper Documents" in Discovery**

On June 11, 2002, LOPA sent a letter to appellees arguing that there was additional insurance coverage beyond what was provided in the 1994 settlement agreement. LOPA cited the section of the settlement agreement which required MCIC to promptly notify appellants of newly discovered coverage and stated: "We believe that such additional coverage does now, in fact, exist." LOPA attached a copy of the order in the *Wallace & Gale* case, and noted that,

> As you will see in that opinion, asbestos contractors, such as Wallace & Gale and MCIC, are afforded much more extensive coverage under standard CGL policies than what you and the other insurance carriers represented in the Settlement Agreement.
>
> In light of the Wallace & Gale decision and your familiarity therewith, we assume that you have undertaken a review of your policies and discovered that additional coverage now exists to fully compensate all previous . . . and pending claims against your insured.
>
> Enclosed . . . is a copy of the . . . cases which, pursuant to the Settlement Agreement, should receive additional compensation because additional insurance is now available . . . . However, please note that we are not willing to accept the rather small amounts contained in the Settlement Agreement. Those amounts were accepted only because we relied upon the insurance carriers' *material misrepresentation of the insurance coverage available.*

(Emphasis added).

On October 17, 2002, in the absence of a satisfactory response from appellees, LOPA filed, under seal and unknown to the other appellants, a Motion to Enforce

Settlement Agreement in the Circuit Court for Baltimore City. In the motion, LOPA requested the court to order each insurance company to tender all insurance coverage available, or in the alternative, to pay the LOPA plaintiffs an equitable amount taking the new insurance coverage into account. On October 30, 2002, the LOPA plaintiffs and appellees entered into a Standstill and Tolling Agreement, agreeing to halt litigation while they discussed LOPA plaintiffs' claims.[16] This agreement was amended several times, extending the tolling of limitations for a total of 334 days.

On April 26, 2004, MCIC responded to a LOPA discovery request and produced over one thousand pages of what appellants have designated as the "Chapper Documents." The Chapper Documents consist of various correspondence, notes, and memoranda generated between MCIC and its insurers from June 1981 through November 1994. According to LOPA, the Chapper Documents demonstrate that MCIC knew as early as 1985 that appellants had claims for operations coverage because many of the plaintiffs were exposed to asbestos during installation.

Almost two years after LOPA filed its Motion to Enforce Settlement Agreement under seal, the Non-LOPA plaintiffs learned of LOPA's motion. The Non-LOPA plaintiffs filed motions to intervene, which the court granted on June 7, 2004.

---

[16] The non-LOPA appellants were not part of that agreement because they had not yet moved to intervene in the case.

**The Circuit Court Dismisses the Motion to Enforce Settlement Agreement**

On August 5, 2004, the circuit court dismissed appellants' Motion to Enforce Settlement Agreement on the ground that the motion was time-barred. The court explained its holding:

> Assuming that the development of a new legal theory of coverage amounted to a "discovery" of the "fact" that additional coverage existed under the settled policies, such discovery by MCIC occurred no later than 1998 when the Angelos plaintiffs' counsel met with counsel for MCIC, explained their legal theory of recovery and opined that the Insurers owed more under the Settlement Agreement than the amounts represented in their affidavits. Upon MCIC's discovery of this additional "other insurance," the Angelos plaintiffs could have brought their Motion to Enforce Settlement Agreement. They sat on their claim, however, until October 17, 2002, over a year after the analogous limitations period for contract actions had lapsed. Ultimately, Plaintiffs have "failed to act with due diligence in the pursuit and enforcement of [their asserted] rights," and prejudice is demonstrated by their failure to bring their Motion to Enforce within the length of the analogous limitations period.

(Citations omitted).

Appellants appealed and a panel of this Court affirmed in an unreported opinion. *See Anderson v. Royal Indemnity*, No. 1962, Sept. Term 2004 (filed May 15, 2006). In holding that appellants' claims pursuant to the Motion to Enforce Settlement Agreement were time-barred, the *Anderson* panel stated that,

> the appellants were on inquiry notice of their potential claims for additional insurance coverage under the 1994 settlement agreement well over three years before they filed their respective motions to enforce in 2002 (and beyond). When we filed the reported opinion in the *Porter Hayden* case in August of 1997, and that case became part of the public domain, any Maryland attorney whose practice involved asbestos litigation and insurance coverage for such cases was on notice that there might be nonproducts liability, and correspondingly, insurance coverage for such nonproducts liability, that exceeded the liability coverage previously assumed to be

applicable. The Gilbert report makes [it] clear that by May of 1998, this development in the asbestos field was widely known, and that the prospect of insurance coverage that was not subject to aggregate limits was not ignored by asbestos plaintiffs' attorneys.

*Id.*, slip op. at 23.[17] The Court of Appeals subsequently denied appellants' petition for writ of certiorari. *Anderson v. Royal Indemnity*, 394 Md. 479 (2006).

## The Instant Case: Claims for Misrepresentation and Concealment

On May 10, 2005, while the *Anderson* appeal was pending, LOPA filed a new complaint in the Circuit Court for Baltimore City. The complaint, and its subsequent history, form the basis for this appeal. In the operative complaint, LOPA alleged that MCIC and its insurers had committed: 1) negligent misrepresentation, 2) fraudulent misrepresentation, and 3) fraud by concealment.[18] By virtue of these misrepresentations and concealments, LOPA argued, the appellees settled with appellants for sums not representative of the full amount of MCIC's available insurance coverage.

In early 2007, the circuit court permitted the non-LOPA plaintiffs to intervene and file complaints of their own. All appellants alleged that the Chapper Documents indisputably demonstrated that the appellees knew prior to and during settlement negotiations that appellants maintained claims that were operational in nature for which non-products coverage would be available.

---

[17] We will discuss the significance of the Gilbert Report later in the opinion.

[18] The complaint contained four additional counts for declaratory relief. The circuit court dismissed these four counts, and they are not before us on appeal.

**The Circuit Court Dismisses Appellants' Claims for Negligence and Fraud**

On November 20, 2012, the circuit court granted appellees' motions for summary judgment, dismissing appellants' claims for negligent misrepresentation, fraudulent misrepresentation, and fraud by concealment on the ground that the claims were time-barred.

The circuit court began its discussion of the time-barred counts by noting that "the running of the statute [of limitations] is 'activated by actual knowledge--that is express cognition, or by awareness implied from knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry.'" (Citing *Bacon v. Avery*, 203 Md. App. 606, 652 (2012)) (internal quotation marks omitted). In the context of fraud, the court explained that, "being 'on notice' means having knowledge of circumstances which would cause a reasonable person in the position of the plaintiffs to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged fraud." (Citing *O'Hara v. Kovens*, 305 Md. 280, 302 (1986) (internal quotation marks omitted)).

Having established the applicable rules for the running of limitations, the court next found the undisputed facts of the case. The court found that although the Nagle Documents consisted of fragmentary policy materials, the Declaration pages and other forms made clear the nature and scope of the policies insuring MCIC. In reviewing three largely complete policies, the trial court found that "each of those policies contains the exact same language relating to the products hazard, the completed operations hazard, the occurrence definition, and the limits of liability. Each provides for an aggregate limit for claims within

the completed operations and products hazards." The court explained that, because the form explicitly states the circumstances in which aggregate limits do apply, inferentially, these aggregate limits do not apply to any other form of coverage. After establishing what appellants could and should have understood from the Nagle Documents, the court turned to the issue of when the appellants should have been on notice of their claims.

For the third time, a Maryland court found that the date we decided *Porter Hayden* put these appellants on notice that they had claims against the appellees. The circuit court found that,

> Regardless of what they may or may not have known prior to *Porter Hayden* about the legal categorization of asbestos-related injuries for purposes of insurance coverage, all plaintiffs' counsel are charged with knowing that such injuries could be covered under non-products CGL provisions after its publication on August 29, 1997.

The trial court rejected the notion that the appellants had raised a genuine dispute of material fact sufficient to survive a motion for summary judgment. Instead, it found that possession of the Nagle Documents, coupled with the publishing of *Porter Hayden*, put appellants on notice that the settlement agreement and the incorporated affidavits were wrong. Because appellants filed their claims more than three years after being on inquiry notice of those claims, the trial court granted summary judgment against appellants based on limitations. It is this legal conclusion that appellants challenge on appeal.

**STANDARD OF REVIEW**

The Court of Appeals recently set forth the appropriate standard of review in cases where the circuit court grants summary judgment:

-21-

We review the Circuit Court's grant of summary judgment as a matter of law. *Goodwich v. Sinai Hosp. of Balt., Inc.,* 343 Md. 185, 204, 680 A.2d 1067, 1076 (1996) ("The standard of review for a grant of summary judgment is whether the trial court was legally correct." (citation omitted)). Before determining whether the Circuit Court was legally correct in entering judgment as a matter of law in favor of [appellees], we independently review the record to determine whether there were any genuine disputes of material fact. *Hill v. Cross Country Settlements, LLC,* 402 Md. 281, 294, 936 A.2d 343, 351 (2007). A genuine dispute of material fact exists when there is evidence "upon which the jury could reasonably find for the plaintiff." *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 739, 625 A.2d 1005, 1011 (1993) (citation omitted). "We review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Myers v. Kayhoe,* 391 Md. 188, 203, 892 A.2d 520, 529 (2006) (citation omitted).

*Windesheim v. Larocca*, 443 Md. 312, 326 (2015).

"We generally limit our review to the grounds relied upon by the trial court." *Benway v. Md. Port Admin.*, 191 Md. App. 22, 46 (2010). *Accord PaineWebber Inc. v. East*, 363 Md. 408, 422 (2001) (stating that, "In appeals from grants of summary judgment, Maryland appellate courts, as a general rule, will consider only the grounds upon which the lower court relied in granting summary judgment."). **"We may, however, affirm the grant of summary judgment on a ground not relied upon by the circuit court if the alternative ground is one upon which the circuit court would have no discretion to deny summary judgment."** *Rogers v. Home Equity USA, Inc*., 228 Md. App. 620, 635 (2016) (internal quotation marks and citations omitted) (quoting *Warsham v. James Muscatello, Inc.*, 189 Md. App. 620, 635 (2009)).

## DISCUSSION

## Inquiry Notice

The trial court correctly granted summary judgment in dismissing the claims as time-barred. "A civil action at law shall be filed within three years *from the date it accrues* unless another provision of the Code provides a different period of time within which an action shall be commenced." CJP § 5-101 (emphasis added). In determining when an action accrues, Maryland courts recognize the discovery rule. Originally, the discovery rule was an exception that prevented the statute of limitations from starting to run until a victim became aware of a wrong. *Lumsden v. Design Tech Builders, Inc*., 358 Md. 435, 442 (2000). The exception became the rule in *Poffenberger v. Risser*, where the Court of Appeals held "the discovery rule to be applicable generally in all actions and the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." 290 Md. 631, 636 (1981).

A claimant should know of the wrong "if the claimant has 'knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.'" *Lumsden*, 358 Md. at 445 (quoting *Poffenberger*, 290 Md. at 637). The concept of "inquiry notice" controls when limitations begin to run. A claimant is on inquiry notice when the claimant "has 'knowledge of circumstances which would cause a reasonable person in the position of the plaintiff[] to undertake an investigation which, if pursued with reasonable diligence, would

-23-

have led to knowledge of the alleged [tort].'" *Lumsden*, 358 Md. at 446 (citation omitted) (quoting *O'Hara v. Kovens*, 305 Md. 280, 302 (1986)).

### Inquiry Notice: The Similarities Between Negligent and Fraudulent Misrepresentation

A claim for negligent misrepresentation requires the defendant to make a false statement negligently. *Lloyd v. General Motors Corp*., 397 Md. 108, 136 (2007) (citations omitted). Fraud claims differ only in that they require the defendant to know the falsity of the statement, or to have made the statement with such reckless disregard for the truth as to impute knowledge. *Univ. Nursing Home, Inc. v. R.B. Brown & Assocs., Inc*. 67 Md. App. 48, 61 (1986). Maryland courts have used the term "*scienter*" to refer to the legally culpable state of mind that encompasses either reckless indifference or actual knowledge. *See Ellerin v. Fairfax Sav., F.S.B*., 337 Md. 216, 232 (1995) (recognizing that the tort of fraud or deceit requires *scienter*—the defendant's knowledge that either his statement was false, or that he was recklessly indifferent as to whether his statement was true or false.) When *Porter Hayden* became part of the public domain, and the controlling law in Maryland, all appellants knew that they had been wronged—they had settled a case based on the misrepresentation that only products coverage was available—and then learned that operations coverage had been available all along. The publication of *Porter Hayden* combined with possession of the Nagle Documents put all appellants on inquiry notice that the assurances in the affidavits and settlement agreement were false. All appellants were on inquiry notice, at the very least, that the statements may have been made negligently.

Generally, "[o]nce on notice of one cause of action, a potential plaintiff is charged with responsibility for investigating, within the limitations period, all potential claims and all potential defendants with regard to the injury." *Doe v. Archdiocese of Washington*, 114 Md. App. 169, 188 (1997). We note that reckless indifference, a basis for a fraudulent misrepresentation claim, is the next step up the evidentiary ladder from mere negligence. Because here these torts stem from the same false statements and the same harm, we hold that appellants were also on inquiry notice of their claims for fraudulent misrepresentation.

**The *Scienter* in Fraudulent Misrepresentation is Not Limited to Actual Knowledge of the Falsity of the Statement**

All appellants incorrectly classify the *scienter* here in terms of a "knowing" falsity. The LOPA plaintiffs, in their opening brief, state that, "Defendants concealed all of the many key facts showing that their settlement representations were *knowingly* false and made with the intent to deceive." The Goldman plaintiffs wrote in their opening brief that, "fraud requires *scienter*, and the fraud claim here arose from facts that the Insurers concealed what they all *knew* the true 'limits' of the policies to be in 1994." (Emphasis added). Finally, the GME plaintiffs wrote that, "The fact that MCIC and the Insurers *knew* the 'public classification' was false, and hence the '*knowledge*' or '*scienter*' element of the fraud, would never have been discovered but for the production of . . . [the Chapper Documents]." (Emphasis added). The inherent error in these statements is that they all treat *scienter* as if it only means actual knowledge. This is not always the case. In *Ellerin*, the Court of Appeals reaffirmed that the *scienter* element in a fraud claim can also refer to reckless indifference, a mental state falling short of actual knowledge. The Court

acknowledged that most fraud cases contain allegations of actual knowledge, but stated

that Maryland still recognizes reckless indifference as a basis for fraud:

> Although Maryland cases since *McAleer v. Horsey*, *supra*, 35 Md. 439, have consistently stated that the tort of fraud or deceit may be committed by a defendant who is recklessly indifferent to the truth of the statement that deceives the plaintiff, there appears to be no decision of this Court sustaining a judgment in favor of the plaintiff on this basis. The fraud cases in this Court have generally involved findings or allegations that the falsity of the representation was actually known to the defendant.

*Ellerin*, 337 Md. at 232-33. This does not mean that Maryland does not recognize a claim

for fraud under a theory of reckless indifference. Instead, the Court explained the line of

demarcation for culpability between reckless indifference and actual knowledge. The

*Ellerin* Court explained that the mental state of reckless indifference does not rise to the

level of knowingness in actual knowledge.

> On the other hand, when a particular fraud or deceit action is based on the alternative form of the knowledge element, namely a "reckless disregard" as to the truth of the representation, the traditional basis for the allowability of punitive damages is not present. As we have earlier explained, "reckless disregard" in this context does not mean a situation where the defendant honestly, but negligently, believed that the representation was true. *Nevertheless, it does not mean actual knowledge of the falsity*. Under the principles set forth in several of our earliest cases, and reaffirmed in *Owens-Illinois v. Zenobia* and other recent cases, "reckless disregard" or "reckless indifference" concerning the truth of the representation falls short of the mens rea which is required to support an award of punitive damages.

*Id*. at 235 (emphasis added). Therefore, while a plaintiff alleging fraud may recover

punitive damages for proving actual knowledge, this relief is not available to the plaintiff

who alleges reckless indifference. *Id*.

When the appellants here treat "actual knowledge" interchangeably with "*scienter*" they do so because they believe that they are entitled to relief based on their theory that the appellees had actual knowledge of the falsity of their statements. The statute of limitations, however, depends on inquiry notice of a harm, not the legal theory that applies to that harm. "Knowledge of *facts* . . . not actual knowledge of their legal significance, starts the statute of limitations running." *Moreland v. Aetna U.S. Healthcare, Inc.*, 152 Md. App. 288, 297 (2003) (quoting *Miller v. Pac. Shore Funding*, 224 F. Supp. 2d 977, 986-87 (D. Md. 2002)). It is not the legal theory that starts the clock for the purposes of inquiry notice—it is a recognition of the facts. *Id*. Limitations begin to run when a plaintiff reasonably knows or should know of *facts* that show he has been injured or harmed by a wrong. *Lumsden*, 358 Md. at 452. To be on inquiry notice of their potential claims, the appellants did not need to be able to articulate a complete theory that appellees actually knew that their representations were false. As we will show, appellants should have known after *Porter Hayden* that appellees' false statements could have been negligently made; likewise they should have reasonably suspected reckless indifference, a mental state more culpable than mere negligence, but below that of actual knowledge.

**Appellants Do Not Need to Know Appellees' Mental States to be on Inquiry Notice of Their Misrepresentation Claims**

Appellants argue that the only way they could have been on inquiry notice of their fraud claims was to know the appellees' *scienter*. Appellants point to *O'Hara* to support this argument. The unique facts in *O'Hara*, however, involved a scenario in which the only way the plaintiffs could have known of their injury would have been to know the

mental state—the *scienter*—of the defendants. In *O'Hara*, plaintiffs owned approximately 30% of the outstanding stock in the Marlboro racetrack. 305 Md. at 282. In May of 1971, Governor Mandel, working with the Kovens Group—co-defendants with the Governor— vetoed a bill that would have allowed additional racing days at the Marlboro track, and consequently, would have increased the value of the plaintiffs' stock. *Id*. at 283-84. In December of 1971, plaintiffs sold their stock to the Kovens Group. *Id*. at 282-83. After the Kovens Group purchased the stock, the Maryland General Assembly overrode the veto in January of 1972. *Id*. at 284-85.

On November 24, 1975, the federal government filed indictments against Governor Mandel and other members of the Kovens Group for mail fraud. *Id*. at 285, 303. The plaintiffs thereafter developed a theory that the Kovens Group and Governor Mandel had artificially depressed the value of the Marlboro stock by having Governor Mandel veto the bill permitting additional racing days. *Id*. at 286. Then, with the price artificially depressed, the Kovens Group would purchase the stock. *Id*. Finally, once the Kovens group was in possession of the stock, Governor Mandel would induce the General Assembly to override his veto and consequently raise the stock's value. *Id*. The *O'Hara* plaintiffs filed their claim on November 22, 1978, and alleged that the Kovens Group defrauded them in December of 1971 when they purchased the devalued stock. *Id*. at 283. The Kovens Group argued that, due to various news articles and media coverage prior to the issuance of the indictments, the plaintiffs' claims accrued on October 23, 1975, and

-28-

were therefore time-barred. *Id*. at 290. The plaintiffs disagreed, arguing that they were only on inquiry notice of their harm in November of 1975. *Id*. at 292.

The Court of Appeals began its limitations analysis by noting that "[inquiry] [n]otice is not limited to actual knowledge of the fraud. Nor does it mean discovery of proof which, if believed, would, in the opinion of counsel, take the case to the jury on the merits. It is not limited to admissible evidence." *Id*. at 301. The Court explained,

> We have seen, as discussed above, how being "on notice" means having knowledge of circumstances which would cause a reasonable person in the position of the plaintiffs to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged fraud. Further, because the notice must relate to the fraud alleged, notice in this case must relate to the plaintiffs' claim that a conspiracy within the Kovens Group antedated the veto. *Critical to the claim is the state of mind of Governor Mandel* prior to May 28, 1971. The theory is that the veto message . . . misrepresented the true reasons for the veto, which had been cast to depress Marlboro stock, not simply incidentally, but for the purpose of benefiting co-conspirators as future stock purchasers.

*Id*. at 302 (emphasis added) (citation omitted). The Court observed that the claim itself hinged upon Governor Mandel's state of mind, or his alleged *scienter*. Selling one's stock, on its own, would not put a reasonable person on inquiry notice of a wrong. Knowledge that the stock sold had been artificially depressed in value at the time of sale, however, would put a reasonable person on inquiry notice to investigate further and uncover the fraud. Without inquiry notice of Governor Mandel's state of mind—his alleged *scienter*— the plaintiffs in O'Hara would not have had any reason to investigate the fairness of their transaction and uncover the fraud. This does not mean, however, that inquiry notice for all fraud claims depends upon a recognition of the defendant's *scienter* or mental state.

Another leading case on inquiry notice, *Lumsden*, demonstrates that mere recognition of an injury suffices to place a plaintiff on inquiry notice. In *Lumsden*, plaintiffs discovered that their driveways suffered from peeling and scaling following a snow storm in March of 1994. 358 Md. at 437. Despite recognizing the harm to their driveways, the plaintiffs did not discover the cause of that damage—application of de-icing chemicals—until five months later, in August of 1994. *Id*. The plaintiffs filed claims for breach of an implied statutory warranty against defects on April 8, 1996, two years and one month after observing the damage to their driveways. *Id*. at 438. The trial court found that the claims were time-barred and dismissed them.[19] *Id*. On appeal, the plaintiffs argued that limitations did not begin to run until August 1994, when their investigation revealed what caused the harm to their driveways. *Id*.

The Court of Appeals held that the plaintiffs were on inquiry notice of their claims in March of 1994 when they discovered the harm. *Id*. at 452. In holding that the plaintiffs were time-barred from pursuing their claims, the Court stated that the plaintiffs "knew immediately upon seeing the damage done to their driveways that a defect existed for which someone was responsible." *Id*. at 448-49. Further, the Court noted that, "[i]n this case, the harm to petitioners was . . . apparent, enough so that a reasonably prudent person would have begun investigating the cause of the harm." *Id*. at 449. The Court held that plaintiffs were on inquiry notice upon recognizing the harm stating,

> *The statute of limitations begins to run when claimants gain knowledge*
> *sufficient to put them on inquiry notice generally when they know, or should*

[19] A two year statute of limitations applied in *Lumsden*. 358 Md. at 439.

-30-

*know, that they have been injured by a wrong*. From that date forward, a claimant will be charged with knowledge of facts that would have been disclosed by a reasonably diligent investigation, regardless of whether the investigation has been conducted or was successful.

*Id*. at 452 (emphasis added). The Court noted that mere knowledge that a plaintiff "may have been harmed" would suffice to put that plaintiff on inquiry notice. *Id*. at 447 (quoting *Russo v. Ascher*, 76 Md. App. 465, 470 (1988)). The Court also noted that a plaintiff need not be on inquiry notice of all of the elements of his claim to be on inquiry notice of the wrong. "[I]t is the discovery of the injury, and not the discovery of all of the elements of a cause of action that starts the running of the clock for limitations purposes." *Id*. at 450 (quoting *Bayou Bend Towers Council of Co-Owners v. Manhattan Const. Co.*, 866 S.W.2d 740, 743 (Tex. App. 1993)). Inquiry notice is triggered when the plaintiff recognizes, or reasonably should recognize, a harm—not when the plaintiff can successfully craft a legal argument and not when the plaintiff can draft an unassailable and comprehensive complaint.

The final case that supports our holding that a plaintiff need not be on inquiry notice of a defendant's *scienter* in order for limitations to begin to run is *Windesheim*, 443 Md. 312. In *Windesheim*, plaintiffs obtained home equity lines of credit ("HELOCs") from defendants in order to participate in a "buy-first-sell-later" plan to buy new homes before selling their current residential homes. *Id*. at 319. The plaintiffs signed applications in 2006 and 2007 that defendants had created in furtherance of that plan. *Id*. at 320. Allegedly unbeknownst to plaintiffs, the defendants falsely represented on these applications that the plaintiffs were receiving income from their primary residences so that they could qualify

for the loans needed to buy their new homes. *Id*. at 323. In 2010 and 2011, plaintiffs allegedly learned for the first time that the applications they had signed in 2006 and 2007 reported this false rental income, and filed suit for fraud. *Id*. Defendants moved to dismiss the claims as time-barred. *Id*. at 324.

On appeal, the plaintiffs contended that "even assuming . . . that they [the plaintiffs] had read the applications, the contents of those documents would not induce a reasonable person to investigate a potential fraud." *Id*. at 328. The Court of Appeals disagreed. It rejected the plaintiffs' theory that they could not have known about the fraud in 2006 and 2007, and held that the plaintiffs were on inquiry notice by virtue of their signing the applications. *Id*. at 334. It explained,

> [W]e conclude that [plaintiffs'] knowledge of the contents of the Applications was sufficient to place them on inquiry notice of their claims against [defendants] when [plaintiffs] closed their HELOCs and primary residential mortgages in 2006 and 2007. Because [plaintiffs] signed the Applications at the closings, they are presumed to have read and understood their contents. *With knowledge of facts about which they claim they were deceived and that suggested that their loan transactions were not proceeding as they expected*, [plaintiffs] had information that "would cause a reasonable person in the position of [plaintiffs] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [fraud]."

*Id*. (emphasis added) (citation omitted). The Court held that the plaintiffs were on inquiry notice of their fraud claims based upon their knowledge of the contents of the applications and the fact that the applications did not comport with the agreed upon loan transactions. The analysis focused on what the plaintiffs could and should have known rather than the defendants' mental states. The plaintiffs, upon receiving and signing the applications, were

-32-

able to learn of the facts necessary to uncover the fraud alleged, and were therefore on inquiry notice of their claims at that time.

We hold that, as a matter of law, the appellants here were on inquiry notice of their claims for misrepresentation because two important facts revealed themselves to the appellants when we published *Porter Hayden*. First, that under the express terms of the insurance policies, the appellees owed appellants more money than initially thought. Limitations began to run when the appellants gained "knowledge sufficient to put them on inquiry notice generally when they [knew], or should [have known], that they [had] been injured by a wrong." *Lumsden*, 358 Md. at 452. Second, that the statements provided in the affidavits and settlement agreement—that all applicable coverage had been tendered— were false. "With knowledge of facts about which they claim they were deceived," appellants could have realized that the appellees had made actionable misrepresentations. *Windesheim*, 443 Md. 334.

### The Gilbert Report Establishes that LOPA Plaintiffs were on Inquiry Notice after *Porter Hayden*

We have explained that a party is on inquiry notice of a cause of action when it obtains "knowledge of circumstances which would cause a reasonable person in the position of the plaintiffs to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged fraud." *O'Hara*, 305 Md. at 302. The record shows that the LOPA plaintiffs did, in fact, recognize their harm, and pursued an investigation before they received the Chapper Documents.

-33-

LOPA plaintiffs sent a letter to MCIC shortly after the *Porter Hayden* decision—which demonstrates what a reasonable person in the position of the plaintiffs would have suspected—and indisputably shows what LOPA plaintiffs did suspect. In its October 3, 1997 letter, Angelos wrote to MCIC that, "It has recently come to my attention that the information provided by the insurers may be inaccurate, and additional insurance funds may be available under the terms of the policies." By suspecting that the insurers had provided "inaccurate" information and that additional funds were possibly available, Angelos's letter establishes that he was aware of the harm to his clients in October 1997—they deserved more money. Even if Angelos had been uncertain that additional funds were available, the Gilbert Report should have confirmed his suspicions.

In May 1998, LOPA hired Scott Gilbert to prepare an expert report in *In re Wallace and Gale*. The Gilbert Report relied on *Porter Hayden*, and stated that "Maryland courts have adopted the view that asbestos installation claims are nonproducts claims not subject to aggregate limits." By May of 1998, LOPA was arguing for nonaggregated limits from operations coverage in other court cases—but not this case. LOPA recognized that a standard CGL policy provided nonaggregated limits for injuries sustained during installation. The suspicions LOPA raised in its October 3, 1997 letter were now confirmed, proving that LOPA was on inquiry notice that it had been harmed by appellees' misrepresentations. Consequently, limitations began to run for LOPA no later than May 4, 1998 when Gilbert filed his report. *Lumsden*, 358 Md. at 452. LOPA filed its claims

for negligent and fraudulent misrepresentation in May 2005, seven years after it was on inquiry notice, and at least four years too late.[20]

**Non-LOPA Plaintiffs were also on Inquiry Notice after *Porter Hayden***

Although they were not involved with the Gilbert Report, the Non-LOPA plaintiffs were also on inquiry notice after the *Porter Hayden* decision. Like the LOPA Plaintiffs, they signed the settlement agreement only after receiving assurances from the affidavits and settlement agreement itself that no other coverage applied or was available. Although the Non-LOPA plaintiffs did not take any overt action that demonstrably shows they were on inquiry notice of their claims, the test here is whether a reasonable person in the position of the plaintiffs would have made such an investigation. As a panel of this Court explained in *Anderson*, "When we filed . . . *Porter Hayden* . . . any Maryland attorney whose practice involved asbestos litigation and insurance coverage for such cases was on notice that there might be nonproducts liability." Slip op. at 23. Although the Non-LOPA plaintiffs did not outwardly acknowledge the theory of recovery like the LOPA plaintiffs did with the Gilbert Report, the Non-LOPA plaintiffs were nevertheless on inquiry notice of the harm stemming from the settlement agreement.

As we previously explained, the plaintiffs in *Windesheim* sought to sue defendants for fraud based on "an elaborate 'buy-first-sell-later' mortgage fraud arrangement." 443 Md. at 319. As part of the arrangement, the plaintiffs completed applications which falsely

---

[20] The Standstill and Tolling Agreement that LOPA entered into with appellees on October 30, 2002, is immaterial to our analysis.

-35-

claimed that the plaintiffs were receiving rental income from their primary residences. *Id*. at 321-22. The Court of Appeals held that the plaintiffs were on notice when the loan transactions failed to comport with the signed applications in plaintiffs' possession. *Id*. at 334. Here, all appellants possessed the fragmentary policy documents—they refused to settle without them. With the publication of *Porter Hayden*, the Non-LOPA plaintiffs should have recognized that they had not received all of the available and applicable coverage that had been promised. This should have also revealed to them that the statements contained in the affidavits and settlement agreement pertaining to available and applicable coverage were false. A reasonable person in the position of these plaintiffs, on inquiry notice, would have pursued an investigation. *Id*. A reasonably prudent investigation would have independently revealed most, if not all, of the conclusions in the Gilbert Report.

## Limitations is not a Jury Question in this Case

Appellants urge us to remand the case so that a jury can resolve disputed material facts and determine when they were on inquiry notice for purposes of limitations. They correctly note that "questions of fact on which a limitations defense will turn are to be decided by the jury or, when sitting as a jury, by the court." *O'Hara*, 305 Md. at 301. We are not unmindful of the fact that,

> whether or not the plaintiff's failure to discover his cause of action was due to failure on his part to use due diligence, or to the fact that defendant so concealed the wrong that plaintiff was unable to discover it by the exercise of due diligence, is ordinarily a question of fact for the jury.

*Id*. at 294-95 (internal citations and quotation marks omitted). We note, however, that "When a cause of action accrues is usually a legal question for the court." *Moreland*, 152 Md. App. at 296. "Depending on the nature of the assertions being made with respect to the limitations plea, th[e] determination [of whether the action is barred] may be solely one of law, solely one of fact, or one of law and fact." *Id*. (quoting *Poffenberger*, 290 Md. at 634). When a party is on inquiry is not always a question of fact, and not always a question for the jury. We hold that here, however, there are no disputes of material fact that require remand to a fact-finder.

*O'Hara* provides useful guidance as to why this case should not be remanded to a fact-finder. As we explained above, Governor Mandel's state of mind, or his *scienter*, was quintessential to the plaintiffs' inquiry notice. Selling stock, on its own, would not put a reasonable person on inquiry notice that he had been harmed. Rather, knowledge that the stock sold had been artificially depressed in value would put a reasonable person on inquiry notice to investigate further and uncover the fraud. To determine whether the *O'Hara* plaintiffs were on inquiry notice, the Court "place[d] [itself] back in time to on or before November 21, 1975. This is before any indictments were returned." *O'Hara*, 305 Md. at 302. The Court then reviewed the possible hypotheses the plaintiffs could have articulated at that time as to their fraud claim.

These hypotheses included:

1. A conspiracy antedated the veto.
2. There was an innocent acquisition of foreknowledge of the veto by persons in the Kovens Group without any conspiracy having been formed.

3. Purchase in June 1971 by one or more of the persons in the Kovens Group of Marlboro stock was without any foreknowledge of the veto.
4. A conspiracy was formed after June 1971 but prior to the stock purchase of December 1971.
5. A conspiracy was formed after the stock purchase of December 1971 but prior to the veto override.
6. A conspiracy was formed after the veto override for the purpose of obtaining enactment of racing consolidation legislation.
7. There was no conspiracy at any time.

*Id.* at 302-03. Of these seven hypotheses, the Court held that "The first hypothesis is the only one involving a conspiracy which could have included as a purpose the injury of Marlboro shareholders, as such, by the veto." *Id.* at 303. In deciding whether the trial court could decide, as a matter of law, whether the plaintiffs were on notice of the fraud, the Court explained,

> Even if we were to assume that the mass of media attention to the Mandel investigation would put reasonable persons on notice as a matter of law that there may have been a fraud in the sense of the mail fraud indictment, *it would still be necessary to infer from that notice that the plaintiffs were also on notice of a conspiracy to depress Marlboro stock which antedated the veto*. That latter inference cannot be drawn as a matter of law on this record because of a multitude of conflicting inferences.

*Id.* (emphasis added). Despite extensive media coverage of Mandel's possible mail fraud, the Court held that the plaintiffs had no way of recognizing that Mandel had also defrauded them into selling their Marlboro stock at a depressed price. The Court emphasized the fact that inquiry notice needed to relate to the Marlboro stock fraud itself. "Notice of the fraud alleged here would require, *inter alia*, awareness of a possibility, to a degree warranting further investigation, that the veto message was designed to cover the real motive for the veto." *Id.* at 304. Because "[i]t [was] at least debatable whether reasonable persons by

November 21, 1975, should have considered that the message might have been a sham," the Court remanded the case for a fact-finder to make that determination. *Id*.

The Court of Appeals' analysis in *O'Hara* focused entirely on what the plaintiffs knew or could have known, and what the plaintiffs did or should have done prior to the issuance of the federal indictments. This makes sense because an inquiry notice analysis hinges upon what the plaintiffs can know and whether their actions are reasonable. In *O'Hara*, the Court held that the only way the plaintiffs could have known of their claims against Governor Mandel and the Kovens Group was to know the true motive behind vetoing the racing bill. The sale of stock provided no indication of fraud—but the sale of stock whose value had been artificially depressed by an intentional scheme did provide an indication of fraud. The challenge for the plaintiffs in *O'Hara* was that Governor Mandel's motive, and not the purchase of the stock, gave rise to inquiry notice. The sale of the depressed stock resulting from the conspiracy, and not the sale of the stock in and of itself, created the actionable harm.[21]

Unlike *O'Hara*, the appellants here could independently verify two important facts after *Porter Hayden*: 1) whether they should have received additional coverage stemming from the insurance policies; and 2) whether the statements made in the affidavits and settlement agreement, that all applicable insurance coverage had been tendered, were false.

---

[21] Appellants also rely on the U.S. District Court case *Green v. Pro Football, Inc.*, 31 F. Supp. 3d 714 (D. Md. 2014) to support their argument that limitations is a jury question. The case is not binding upon us, and we do not find its analysis instructive in resolving inquiry notice for appellants' negligent and fraudulent misrepresentation claims.

The appellants knew they had not received proceeds under operations coverage, but learned that operations coverage was available when we published *Porter Hayden*. Appellants knew or should have known almost immediately that something was amiss. They knew that they had never received any proceeds under non-products (operations) coverage and therefore had not received all available insurance proceeds as appellees had expressly represented. In short, appellants knew or should have known as early as the release of *Porter Hayden* in August of 1997, or at the latest, in May of 1998 when LOPA filed the Gilbert report, that they had tort claims based on misrepresentations. Whereas Governor Mandel's subjective intent could not possibly have been known and therefore alleged until outside sources revealed those facts, here, *Porter Hayden* made clear both the injury and the misrepresentation. After we published *Porter Hayden*, reasonable people in the position of these appellants would have undertaken an investigation to determine whether they had legal recourse. Specifically, appellants were on notice that appellees' misrepresentations were negligent or reckless. Thus, there are no disputed material facts a jury could find that would change that the appellants here were on inquiry notice, at the very latest, in May, 1998.[22]

---

[22] The Goldman plaintiffs allege that they neither received nor possessed the Nagle Documents. The Goldman plaintiffs never produced any evidence below to support the contention that they did not know of the existence of these materials. Instead, as the trial court noted, the record reflects that all plaintiffs knew about and had ready access to these materials. Accordingly, the Goldman plaintiffs raised neither a disputed fact, nor a material one.

**Appellants Incorrectly Rely on *Anderson* to Argue that They Could not Have Known About the Fraud**

Appellants also argue that the unreported opinion in *Anderson* held that there was no evidence of fraud in this case—at least, not until appellants received the Chapper Documents. In *Anderson*, a panel of this Court stated that,

> There was, however, no evidence of knowingly false representations proffered to Judge Kaplan, who rejected the plaintiffs' vague accusations of fraud, noting, "As of 1994, no Maryland court had determined whether personal injury claims arising from exposure to asbestos . . . fell outside of the products/completed operations hazard and were subject only to per occurrence limits." Aside from suspicion and speculation, there was nothing presented to Judge Kaplan to support the plaintiffs' bald assertion that the Insurers *knew* in 1994 what the courts were going to decide in 1997 regarding asbestos coverage under CGL policies. The only evidence offered by the appellants to support the accusation of fraud is the fact that some or all of the Insurers currently concede that the MCIC policies contained unaggregated operations coverage, as did, apparently, all standard CGL policies of the time. But there was no evidence that any of the Insurers would have made such a concession prior to the *Porter Hayden* decision, let alone any evidence that any of the Insurers (or, for that matter, any persons anywhere) were of that opinion at the time the Insurers executed the affidavits attached to the 1994 settlement agreement.

Slip op. at 24-25. Appellants argue that, if the panel in *Anderson* held that there was no evidence of fraud pending the appeal of the Motion to Enforce, they could not have been on inquiry notice prior to receiving the Chapper Documents. As we have explained, appellants did not need to know about the knowing or intentional misrepresentations to be on inquiry notice of their fraud claims—they only needed to know about the harm which resulted from the false statements. Not only do they conflate actual knowledge of fraud with mere inquiry notice, but the holding in *Anderson* does not reach that far.

In stating that there was "no evidence of knowingly false representations proffered to Judge Kaplan," the *Anderson* panel meant just that—the Motion to Enforce and its supporting documents did not contain any evidence of knowingly false representations. The panel simply stated that, at that point, the appellants had not sufficiently alleged fraud. Furthermore, the *Anderson* panel did not discuss inquiry notice, reasonable investigations, or rely on any law in the context of recognizing fraud. In fact, the *Anderson* panel did hold that, "appellants were on inquiry notice of their potential [contract] claims for additional insurance coverage under the 1994 settlement agreement well over three years before they filed their respective motions to enforce in 2002 (and beyond)." *Id*., slip op. at 23. The *Anderson* panel held that the publication of *Porter Hayden* placed appellants on inquiry notice of their contract claims. "Once on notice of one cause of action, a potential plaintiff is charged with responsibility for investigating, within the limitations period, all potential claims and all potential defendants with regard to the injury." *Doe*, 114 Md. App. at 188. A logical extension of the inquiry notice doctrine allows us to conclude that when the plaintiffs were on inquiry notice of their contract claims, they were also on inquiry notice of their misrepresentation tort claims. Indeed, there are substantial policy reasons underlying our conclusion that appellants' contract and tort claims–all arising out of the same facts–should have the same accrual date for limitations.

**Appellants Cannot Rely on CJP § 5-203 to Further Toll Limitations**

Appellants argue that § 5-203 of the Courts and Judicial Proceedings Article provides a basis to toll limitations in this case. Section 5-203 provides, "If the knowledge

of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud."

We have stated that, "the complaint relying on the fraudulent concealment doctrine must also contain specific allegations of how the fraud kept the plaintiff in ignorance of a cause of action, how the fraud was discovered, and why there was a delay in discovering the fraud, despite the plaintiff's diligence." *Doe*, 114 Md. App. at 187 (citations omitted). Even if we assume that the appellees intentionally lied in their affidavits and in the settlement agreement, they could not have hidden from appellants that *Porter Hayden* allowed them to recover under operations coverage, or that *Porter Hayden* revealed actionable negligent or reckless (fraudulent) misrepresentations. In fact, appellees did provide appellants with fragmentary, yet sufficient, documentation to notify them that the policies at issue were standard CGL policies; after *Porter Hayden*, that documentation was sufficient to put them on inquiry notice of their claims. Therefore, appellants cannot rely on § 5-203 of the Courts and Judicial Proceedings Article to toll limitations. In our analysis, appellants have no right to claim, under the circumstances in this case, that the appellees fraudulently prevented them from discovering their claims.

**Conclusion**

We hold that appellants were on inquiry notice of their negligent and fraudulent misrepresentation claims as early as when we published *Porter Hayden*, and at the latest,

when LOPA filed the Gilbert Report.  The trial court correctly concluded that appellants'

claims are barred by the statute of limitations.  Accordingly, we affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.  COSTS TO BE PAID BY APPELLANTS.**